**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Katherine Romano,	Civ. No. 12-137 (SRN/JJK)

    Plaintiff,

v.	**ORDER AND MEMORANDUM**

ReliaStar Life Insurance Company,

    Defendant.

This matter is before the Court on Plaintiff's Motion to Amend Complaint to Claim Punitive Damages (Doc. No. 18). Based on the files, and all the records and proceedings herein, and on the arguments of counsel, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Amend Complaint to Claim Punitive Damages (Doc. No. 18), is **DENIED**; and

2. The attached Memorandum is incorporated by reference.

Date: November 26, 2012

                                        *s/ Jeffrey J. Keyes*
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge

**MEMORANDUM**

**I.	Background**

In her First Amended Complaint, Plaintiff Katherine Romano ("Romano") asserts several causes of action against her former employer, Defendant ReliaStar Life Insurance Company ("Defendant"). Romano now seeks leave to amend that pleading to add a claim for punitive damages. (Doc. No. 18, Pl.'s Mot. to Am. Compl. to Claim Punitive Damages ("Pl.'s Mot.").) Specifically, Romano asserts that she should be allowed to pursue punitive damages on her claim that Defendant unlawfully retaliated against her in response to her report that a supervisor criminally assaulted her in Defendant's Minneapolis office.[1] (Doc. No. 14, First Am. Compl. ¶¶ 38–43.)

Romano started working in Defendant's employee benefits department in Defendant's Minneapolis office in December 2003 and continued through 2011, when the events relevant to her motion to amend occurred. In late 2010, Romano was working on a complex disability claim that was in litigation, and she

---

[1]	Romano clarifies that she is only seeking leave to amend with respect to her claim that her employer terminated her for reporting her supervisor's criminal assault. She does not, for instance, seek punitive damages in connection with her other retaliation claim, in which she asserts that Defendant terminated her in retaliation for reporting the same supervisor's allegedly illegal actions in the handling of a disability benefits claim months before the assault. (Doc. No. 20, Pl.'s Mem. of Law in Supp. of Mot. to Am. Compl. to Claim Punitive Damages ("Pl.'s Mem.") 1–2 & n.1.)

ultimately determined that Defendant should pay the claim for a significant period of disability.  Shortly thereafter, Romano reviewed the same claimant's file for a subsequent disability claim, and again she concluded that Defendant should pay the claim.  However, Romano's supervisor Paula Weakly ("Weakly") wanted her to do additional investigation.  Specifically, Weakly instructed Romano to obtain the claimant's complete file from the Social Security Administration in connection with an award of social security disability income benefits the claimant had received.  Romano believed that she was being asked to do something that was contrary to company policy, unethical, and unlawful.  Thus, in April 2011, she reported her concerns about Weakly's instructions to Terri Spahn, a human resources employee located in Denver.

    Several months later, Romano was scheduled to have a mid-year performance review.  Weakly made comments critical of Romano in the mid-year review, and Romano wrote a rebuttal to Weakly's comments.  On August 25, 2011, Romano sent her rebuttal remarks to Weakly, copying Spahn on the message.  Romano indicated in her remarks that she felt Weakly was bullying Romano and others in the department and expressed her concern that Weakly would retaliate against her for the remarks in the rebuttal.

    According to Romano, her concerns about Weakly's reaction were well founded.  Romano asserts that around 5:15 p.m. that afternoon, she went down

3

3

to Weakly's office to suggest that they discuss the mid-year review and their obvious disagreement. Romano alleges that when she walked into Weakly's cubicle, Weakly looked at her hatefully and then hit her across the left side of her face with a four-inch thick stack of three-ring binders and spiral notebooks Weakly had been holding. (Doc. No. 26, Attach. 4, Letter from Katherine Romano to Terri Spahn 2 (Aug. 29, 2011) ("Pl.'s Statement").) Romano lost her balance and fell to one side, hitting her elbow in the process. Weakly then rushed out of the cubicle and left the building without saying a word to Romano. (*Id.*) There were no witnesses to these events.

With no one on the same floor to discuss what had just happened, Romano went to a different floor to talk with another supervisor, Kim Baker ("Baker"). Romano told Baker what had happened. (*Id.*) According to Baker, Romano rubbed her cheek repeatedly during the meeting and took her glasses off a couple times to rub her eyes. (Doc. No. 26, Attach. 6, E-mail from Kim Baker to Terri Spahn (Sep. 6, 2011 10:16 a.m.) ("Baker Statement").) The following day, Baker told another HR employee that she thought she could see some mild swelling on Romano's cheek, but could not be certain because she did not know Romano very well. (Doc. No. 26, Attach. 10, Emily Babiash Case Chronology Notes (Aug. 26, 2011) ("Babiash Notes").) Ten days later, however, when the incident was being investigated, Baker stated that there had been no

4

marks at all on Romano's face and that she had not been bleeding. (Baker Statement.)

On the day of the incident, Baker told Romano that she could stay home from the office the following day and Romano left Baker's office. Romano went back to her desk and called the police. She also took pictures of the left side of her face with her cell phone. (Pl.'s Statement 2; Doc. No. 26, Attach. 11, Photographs.) As she waited for the police officer to arrive, Romano went back to Weakly's cubicle. There, she saw a spiral notebook lying on the floor inside Weakly's cubicle. She left the notebook there for the police to see. However, the responding officer declined to enter the building when she arrived at the scene. (Doc. No. 26, Attach. 4 at 2.) Instead, the officer took a report and classified the incident as a fifth degree misdemeanor assault. (Doc. No. 21, Decl. of Susan M. Coler ("Coler Decl."), Attach. 4, Aug. 25, 2011 Police Report.)

After the officer left, Romano went back to Weakly's cubicle and picked up the spiral notebook she had seen on the floor. (Pl.'s Statement 3.) She placed it in her bag because she noticed that her hair was stuck in the spiral wire and there was a fresh smear of blood on the back cover. (*Id.*) According to Weakly, however, about forty five minutes before the assault allegedly occurred, she had sent out an email to a colleague concerning a notebook she noticed was missing from her cubicle. (Doc. No. 26, Attach. 5, E-mail from Paula Weakly to Terri

5

Spahn (Aug. 26, 2011 4:15 p.m.).)

After taking the notebook, Romano decided to leave the office, but ran into Baker again, and the two talked for approximately half an hour in the lobby. (Baker Statement.) Baker said that Romano took off her glasses to show Baker where they had been dented when Weakly struck her in the face. But Baker did not recall that they had been dented when she saw Romano earlier that evening. (*Id.*) Apparently, Romano did not mention anything about the notebook she had picked up to Baker during the second meeting. (*See* Doc. No. 24, Aff. of Lisa M. Schmid ("Schmid Aff."), Attach. 2, Dep. of Kim Baker 139:14–22; *cf.* Coler Decl., Attach. 2, Oct. 29, 2012 Dep. of Terri Spahn ("Spahn Dep.") 61:1–62:1.)[2]

Later in the evening of August 25, 2011, after Romano had left the office, she went to the emergency room because she had a headache and was feeling nauseous. (Pl.'s Statement 3; Doc. No. 21, Coler Decl., Attach. 17, Aug. 25,

---

[2] The Court refers here to a portion of Baker's deposition that was not included in the excerpts presented by Romano in support of her motion to amend, but rather was filed in connection with Defendant's opposition. The Court is not permitted to consider *contradictory* evidence submitted in response to a motion to amend to seek punitive damages, but when a party submits only a portion of a deposition transcript and omits other relevant testimony by the same witness, ignoring the full context of the witness's testimony fails to fulfill the Court's gatekeeping function. *See Stepnes v. Ritschel*, Civ. No. 08-5296 (ADM/JJK), 2010 WL 7093560, at *7 (D. Minn. Apr. 13, 2010) (citing *Olson v. Snap Prods.*, 29 F. Supp. 2d 1027, 1033 n.1 (D. Minn. 1998), and 27 Minnesota Practice § 13.19 (2009), concerning consideration of the full evidentiary record where a plaintiff has submitted only a portion of deposition testimony).

2011 Emergency Room Report.) The certified physician's assistant that examined Romano noted that she had a "superficial abrasion" on her left cheek and a "small hematoma" next to her left eye. (*Id.* at 3.) A nurse took photographs of Romano's face, which appear to reveal a minor abrasion on Romano's left cheek, a faint bruise near her temple, and a bend in the left ear piece of her glasses. (*Id.* at 4; Doc. No. 26, Attach. 12, Emergency Room Photos.) In the days that followed the incident, Romano reported experiencing feelings of anxiety, fear, and distress and sought out mental health professionals. (*See* Coler Decl., Attach. Attach. 12, Sept. 9, 2011 Omne Clinic Urgent Care Note.) She was ultimately diagnosed with post-traumatic stress disorder. (*Id.* at 7.)

Between the alleged assault on August 25, 2011, and the date Romano was ultimately terminated, September 19, 2011, Defendant investigated Romano's accusation that Weakly assaulted her. Terri Spahn, who, as noted above, was a human resources officer in Defendant's Denver office, conducted that investigation after receiving a message from Baker about the incident from the evening of August 25. Spahn began by calling Romano the day after the incident to get her story. (Doc. No. 26, Attach. 3, Spahn Case Report 17.) She documented Romano's statements in her report. Later that day, Spahn spoke with Weakly. Weakly told Spahn that she did not hit Romano and gave Spahn a

7

timeline of her afternoon after she received Romano's rebuttal comments concerning the mid-year performance review. (*Id.*) Weakly told Spahn about the fact that a spiral notebook had been missing earlier in the day and let Spahn know that she had emails that would confirm she had been looking for it well before the alleged assault occurred. (*Id.*) On August 30, 2011, Romano informed Spahn that she had the notebook in her possession and wanted it preserved as evidence. (*Id.* at 17–18.) By that time, Weakly had sent Spahn the emails from the afternoon of August 25, 2011, that documented when she noticed a notebook was missing. (*Id.* at 18.)

On September 7, 2011, Romano sent Spahn her original written statement about the assault, the notebook Romano took from Weakly's cubicle, and some information from Romano's doctor. (Spahn Case Report 18.) Spahn observed hairs stuck in the notebook's spiral wire and a stain that Romano claimed was blood on its back cover. And based on the writing in the notebook, Spahn concluded that it belonged to Weakly. Two days later, Weakly gave Spahn an independent description of the notebook that she believed had gone missing before the assault allegedly occurred. Based on that description, Spahn believed Weakly was describing the same notebook Romano had sent her. (*Id.*)

On September 19, 2011, Spahn and Baker called Romano to inform her of the decision to terminate her employment with Defendant immediately. They

explained the basis for the decision on that call. They noted the following factors leading to that decision: the absence of any witness to the alleged assault; the fact that the Weakly indicated the notebook was missing much earlier in the day; Romano's failure to report that she had the notebook until several days after the assault allegedly occurred; and the fact that Baker had not seen any laceration or scratch on Romano's cheek in the two meetings that occurred on the night of the incident. Ultimately, Baker and Spahn believed that Romano had fabricated a story about the assault. (Spahn Case Report 19.)

Leading up to this decision, however, Spahn did not provide Baker with the underlying evidence concerning the alleged assault, even though Baker ultimately made the decision to terminate Romano's employment. (*See* Spahn Dep. 62:5–63:3.) Instead, Spahn relayed the information she believed Baker needed to reach a decision to Baker. (*Id.* at 63:8–63:19.) Aside from Baker's observations of Romano on the night of the alleged assault, Baker confirmed that she did not independently analyze any of the information submitted to Spahn, but instead relied on information Spahn provided her in reaching the decision to fire Romano. (*See* Doc. No. 26, Attach. 1, Dep. of Kim Baker ("Baker Dep.") 59:19–60:13.)

## II. Discussion

### A. Standard of Review

In diversity actions such as this,[3] the pleading of punitive damage claims must generally conform to the requirements of Minnesota Statutes section § 549.191. *Ulrich v. City of Crosby*, 848 F. Supp. 861, 866 (D. Minn. 1994); *see also Bunker v. Meshbesher*, 147 F.3d 691, 696 (8th Cir. 1998). Section 549.191 requires the court to perform a gatekeeping function to screen out "unmeritorious claims for punitive damages." *Swanlund v. Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). Specifically, the gatekeeping statute provides that the plaintiff may not seek punitive damages at the outset of a civil action. Instead, the plaintiff must make a motion to amend the pleadings to claim punitive damages and support that motion with affidavits showing the factual basis for the claim. The court must give the plaintiff leave to add a claim for punitive damages if it finds that the plaintiff provides prima facie evidence in support of the motion. *Id.*

Because a prima facie showing is one "that prevails in the absence of evidence invalidating it," *Blumberg v. Palm*, 238 Minn. 249, 253, 56 N.W.2d 412, 415 (1953), "the Court reviews the evidence in support of a Motion to Amend as the Court would review a . . . Motion for Judgment as a Matter of Law" under the

---

[3] *See* Doc. No. 1, Notice of Removal ¶¶ 7–9.

Federal Rules of Civil Procedure.  *Ulrich*, 848 F. Supp. at 867; *see also Nw. Airlines, Inc., v. Am. Airlines, Inc.*, 870 F. Supp. 1499, 1502–03 (D. Minn. 1994) (stating that evidence submitted in opposition to the motion is not considered).  In other words, in reaching the determination whether the plaintiff has established a prima facie case for punitive damages, the Court makes no credibility rulings and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof, but the Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a prima facie showing that the substantive requirements for punitive damages have been met.  *Ulrich*, 848 F. Supp. at 867.

To meet the substantive requirements for punitive damages under Minnesota law, a party must show—by clear and convincing evidence—that the defendant acted with "deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a).  Consequently, when the Court considers whether a plaintiff has made a prima facie showing that the substantive requirements for punitive damages have been met, it asks whether the plaintiff has made a prima facie showing of clear and convincing evidence that the defendant deliberately disregarded facts showing a high probability of injury.  *See Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008–09 (D. Minn. 2003) (explaining the inquiry for clear and convincing prima facie evidence that the

11

defendant acted with a deliberate disregard for the rights or safety of others).

### B. Analysis

The issue to be decided on this motion is not whether Romano was assaulted or even whether Defendant ignored facts that made it highly probable that she would be assaulted by coworker. Nor is the issue here whether there is a fact dispute that Defendant fired Romano in retaliation for reporting an assault to her supervisors, an issue that will no doubt be litigated at the summary-judgment phase of this case. Rather, the issue before the Court is whether Romano made a prima facie showing of clear and convincing evidence that Defendant knew it was unlawful to retaliate against Romano for reporting an assault, and in the face of that knowledge, decided to fire her anyway because she reported the assault. *See Hammond v. Northland Counseling Ctr., Inc.*, No. CIV. 5–96–353 MJD/RLE, 1998 WL 315333, at *10 (D. Minn. Feb. 27, 1998) (discussing that the issue on a motion to amend to add punitive damages is whether there has been a prima facie showing that the defendant acted in deliberate disregard of the plaintiff's right to be free from retaliation). Having carefully considered the evidence Romano presented in support of her motion, including the exhibits and the deposition testimony provided, the Court concludes that Romano has failed to make such a showing and denies her motion.

Essentially, Romano argues that Defendant conducted a sham

12

investigation that was so rife with error and replete with flawed methodology that its failings provide prima facie clear and convincing evidence that Defendant intentionally retaliated against her because she reported the workplace assault by Weakly, her supervisor. In other words, she contends that the investigation was so substandard that Defendant's retaliatory intent is clear and the entire investigation was meant only to provide cover for that retaliatory motive. To establish this theory Romano, points to, among other things, the following pieces of evidence:

- Defendant did not implement its workplace violence policy in a way designed to protect Romano's safety because neither Baker nor Spahn told Weakly that she could not reenter the workplace after Romano reported the assault;
- Spahn stated that when she first heard that the assault was reported, she had no reason to believe Weakly would engage in any violence toward Romano;
- Baker lied about the absence of physical evidence that Romano had been assaulted, such as a laceration or swelling on Romano's face;
- Baker never looked at the written statements submitted by Romano or Weakly or reviewed any of the medical records or other evidence in the case personally;
- Weakly read Romano's comments before the alleged assault happened, and therefore had a motive to assault Romano;
- Neither Baker nor Spahn documented the decision-making process during the investigation with sufficient detail; and
- Spahn was equivocal about the reasons for Romano's termination in documentation Defendant later sent to Minnesota's office of unemployment compensation.

This evidence, and the other prima facie evidence Romano presents in support of her punitive damages motion, appears consistent with her theory of

Defendant's retaliatory actions. That is, in the absence of any rebuttal evidence, this evidence may suggest that Defendant intended to fire her in retaliation for reporting a workplace assault.[4] But the gatekeeping statute requires more than the presentation of evidence that is simply consistent with a plaintiff's claim. The gatekeeping statute requires prima facie evidence that clearly and convincingly suggests a deliberate disregard for the plaintiff's rights.

Here, Romano's prima facie evidence fails to clearly and convincingly suggest such a deliberate disregard for Romano's right not to be retaliated against for reporting a workplace crime. Rather than the retaliatory intent Romano asks the Court to infer, Romano's prima facie unrebutted evidence could just as easily suggest that Defendant's human resources personnel are mediocre investigators or even that Baker and Spahn legitimately considered and weighed the evidence they believed was most important and ultimately concluded that they could not believe Romano's story. For example, one could conclude, from looking at Romano's evidence alone, either that Spahn and Baker's failure to document the details of every step in their investigation was part of a scheme to hide their true retaliatory purpose, or that neither is particularly good at running an investigation. Similarly, one could find that Baker

---

[4] Nothing in this Order should be construed as indicating an opinion regarding whether Romano's retaliation claim based on reporting the assault could survive a motion for summary judgment.

14

decided not to examine certain pieces of evidence because Defendant had already determined it would fire Romano in response to her protected conduct, or that Baker simply delegated more authority over the investigation to Spahn than Romano believes appropriate.  The same countervailing conclusions can reasonably be reached concerning each piece of evidence Romano cites and when the evidence presented is considered as a whole.  The possibility of these innocent explanations for Defendant's conduct during the investigation undermines Romano's argument that she has presented prima facie clear and convincing evidence of a deliberate disregard for her rights.

This is not to say that a plaintiff in Romano's position must come forward with a smoking gun.  Of course, a plaintiff will rarely, if ever, have the kind of direct evidence of an employer's deliberate disregard of a whistleblower's rights such as an email between two supervisors discussing the decision to fire an employee because that employee reported illegal conduct, such as the alleged assault in this case.  A plaintiff may appropriately rely on the inferences that can be drawn from other evidence in the record, and if that evidence clearly and convincingly suggests an inference of deliberate disregard of the whistleblower's rights, adding a punitive damages claim may be appropriate. *Cf. Morrow v. Air Methods, Inc.*, 884 F. Supp. 1353, 1355 (D. Minn. 1995) (noting that a discharged former employee's motion to amend his complaint to add a claim for

15

punitive damages based on a claim that his employer illegally retaliated against him had been granted). But here, the Court cannot draw such an inference on the evidence presented about the particular retaliation claim for which Romano seeks to add a prayer for punitive damages. In a different whistleblower case, such as one in which an employee exposes her employer's failure to comply with the law or when an employee refuses to comply with a supervisor's unlawful order,[5] an employer's incentive to take adverse action against the whistleblower is plausible—taking action against the whistleblower could forestall liability flowing from the wrongdoing and potentially keep the whistleblower quiet. But that kind of cogent explanation is not readily discernible on Romano's retaliation claim concerning her report of an assault by a supervisor. Indeed, it is hard to imagine what any employer would think it stood to gain from firing an employee for reporting an assault in the workplace and simultaneously protecting the potentially dangerous employee who committed the offense. The human resources department investigator was located in the Denver office, not the Minneapolis office where Romano worked, and there was no clear and convincing evidence suggesting that she was not a disinterested third party who

---

[5] Romano expressly stated in her moving papers that she was not seeking punitive damages for Defendant's other alleged retaliatory purpose for her termination—that Romano reported Weakly's alleged violation of the law in the handling of one of Defendant's insured's claims. *See supra* note 1.

was making an independent judgment about which employee was telling the truth about the assault.  There was evidence to support her conclusion that Romano was not telling the truth, such as the fact that Weakly reported her notebook missing well before the alleged assault and that Romano said nothing about the notebook until ten days later when it turned out that she had it in her possession all along.  And once Baker received the investigator's conclusions that Romano had lied about the assault, it was necessary to terminate Romano's employment.

## III. Conclusion

Plaintiff has failed to present a prima facie case that would entitle her to allege punitive damages on her claim that she was retaliated against for reporting a workplace assault.  Plaintiff has not met the burden imposed by sections 549.191 to support her motion to amend.  Therefore, Plaintiff's motion is denied.

**JJK**