UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Katherine Romano, | Court File No. 12-CV-00137-SRN/JJK |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| ReliaStar Life Insurance Company, | |
| Defendant. | |

## INTRODUCTION

Defendant ReliaStar Life Insurance Company (referenced here as "ING" or the Company) has a Code of Conduct and Workplace Violence Policy that require its employees to report violations of the law and as well as workplace violence at the Company. Defendant promises that employees who report will be protected from retaliation. Plaintiff Katherine Romano expected that protection when she told her manager and HR that she was being asked to violate the law and would not do it anymore. She also expected that protection when she told Head of Operations Kim Baker that she had been assaulted by her supervisor, Paula Weakly. However, Defendant chose to protect ING and the assaulter instead. ING ignored Romano's complaints about illegal conduct, accused Plaintiff of fabricating the assault, and fired her for making those reports.

Material questions of fact exist that a jury must decide.  These include, but are not limited to,

- whether Paula Weakly physically assaulted Katherine Romano on August 25, 2011
- whether the so-called "investigation" of the assault was such a sham as to constitute a cover-up for a retaliatory motive
- whether Paula Weakly used ING decisionmakers as a "cat's paw"
- whether Paula Weakly's assault of Plaintiff was foreseeable
- whether Paula Weakly demonstrated a "conscious and deliberate" intent to inflict injury
- whether ING's response to plaintiff's complaints was so minimal as to warrant negligent supervision claim

Defendant has failed to show the absence of genuine issues of fact for Plaintiff's claims, making summary judgment inappropriate. [1]

## STATEMENT OF FACTS

## PRE-ASSAULT FACTS

**Katherine Romano's Work History, Position, and Performance at ING**

Plaintiff Katherine Romano began working at ING in June of 2003. (Romano, 17:8-18:4.) At the time of her termination she was a Disability Benefit Adjudicator ("Adjudicator"), Long Term Disability Claims. (Ex. 10.)

Plaintiff loved her job. (Romano Dec., ¶3.) She routinely received scores of "meets" or "exceeds" expectations on her performance reviews. (Romano Dec., ¶4.) From March 2010 to her termination Plaintiff reported to the Long Term Disability Supervisor, Paula Weakly. Weakly reported to Director of Disability Claims, David Corrigan who reported to Kim Baker. (Ex. 52.)

---

[1] Plaintiff hereby withdraws her Count Four claim for Defamation, and therefore necessarily, her Count Five claim for Negligent Infliction of Emotional Distress.

**How Romano Performed Her Duties**

Plaintiff was trained to review long term disability claims fairly and thoroughly in the context of the disability policy involved, ING's procedures, and the laws and regulations applicable to the claim. (Romano 57:15-58-5;111:8-112:21,160:14-161:1, 161:10-13.) Her ultimate goal was "to determine if the person meets the definition of disability and whether or not the claim is payable or not." (Romano, 164:16-165:16.) Plaintiff had the authority to sign off on claims up to a dollar limit of at least $50,000 that she rarely hit. (Romano, 58:6-59;23; Romano Dec.,¶5 .)

The primary laws and regulations to which Plaintiff had to adhere came from ERISA, 29 U.S.C. §1001 *et seq.* (Romano: 63:9-13, 205:7-16; Racette, 29:3-9.) Under ERISA, Plan fiduciaries are required to act solely in the interest of the participants and beneficiaries and to use care, skill, prudence and diligence in their decisions. 29 U.S.C. §1104(a)(1). ERISA regulations further mandate employee benefit plans to establish and maintain reasonable claims procedures to ensure that "plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. §§ 2560-503-1(b)(5) and (d). Plaintiff understood that ERISA required her to be "fair and equal" in her reviews. (Romano, 184:1-6.) Plaintiff further understood that ERISA required her to hold claimants to the same standards and not to treat some claimants differently than others. (Romano, 183:14-21; *see also* Corrigan 22:16-23:16; Racette 30:19-31:4; Romano, 183-14-2.)

**Paula Weakly's Work History and Performance at ING**

Paula Weakly began working at ING in 2004 as an Excess Risk Analyst. (Weakly, 10:7-8; Corrigan, 17:1-11.) In approximately March of 2010, she was hired internally for the time-limited position of Supervisor in Long Term Disability.

Weakly's job was to transition the Long Term Disability team out of existence to a different administrator in Portland, Maine. (Weakly, 6:23-7:4.) Her job duties included "making sure that this project basically ran smoothly so that we could get these claims shipped off to the other company." (Weakly, 14:3-12.)

**Romano's Adjudication of the First Part of the Werb Claim**

In September of 2010, ING selected Plaintiff to execute a court-ordered review of a complex, high-dollar disability claim that was in litigation because the claim had been denied. (Romano. at 151:15-152:9; 155:20-157:14; Weakly Dep. 20:1-23.) The claimant, Michael Werb had been injured in a work-related car accident resulting in ongoing disabling pain. (Weakly 31:21-25; *see also Werb v. ReliaStar Life Ins. Co.*, 847 F.Supp. 2d 11490 (D. Minn. 2012).)

The judge had ordered the Defendant to have the file re-reviewed by a new examiner to determine whether the claim was payable or had been appropriately denied. (Ex. C ; Romano Dec., ¶7.) After completing her review, which took about eighty hours, she sent out a letter in November of 2010 approving the first part of the claim from October 28, 1998 through January 1, 2007. (Romano at 152:15-24; Ex. 83.)

**Romano's Adjudication of the Second Part of the Werb Claim**

In early 2011, Plaintiff was asked to do a second review of the Werb file for the time period from 2007 forward. (Romano at 152:7-14.) She understood her directions to be the same as when she did the first review. (Romano Dec, ¶8.) She reviewed the claim thoroughly and objectively and again concluded that the claim should be paid. (*Id.* at 166:17-167:2.) "I had made my decision, it wasn't like I thought I was going to approve it. I had made the decision to approve it." (*Id.* at 166:25-167:2.)

Plaintiff told Weakly that she had decided that the claim should be paid. (*Id.* 169:3-9.) Weakly learned that Plaintiff was scheduled for a meeting on March 22, 2011 with the ING Werb attorney and insisted on attending. (*Id.*, 170:5-7; Ex. D; ¶10.) After the meeting, Plaintiff was stopped from approving the claim. (Romano, 167:9-21; 169:8-24.)

**Weakly's Treatment of Romano and Romano's Reports in the Spring and Summer of 2011**

Plaintiff and Weakly admittedly had some disagreements prior to spring of 2011. (Romano: 139:15-141: 6; 142:7-18.).[2] However, Plaintiff experienced a radical negative shift in Weakly's attitude towards her after she had decided to affirm the second Werb claim, but was stopped from doing so. (Romano:150:14-151:4.)

---

[2] Regardless whether cell phone use was actually a problem, Weakly noted in her deposition that it was not much of a problem  in 2011. (Weakly, 17:9-18:19.) And Plaintiff did not "hide" in rooms to make calls (Def. Brief at 6); she was using a private place as instructed by Weakly, so as not to disturb others.  (Romano Dec., ¶22.)

Weakly aggressively took over management of the claim and demanded that Plaintiff take certain actions as part of an "investigation" even though Plaintiff disagreed that those actions were necessary or appropriate. (*Id.* at 166:166:6-167:2; 168:23-170:7.) Weakly "undertook to look up some information on the Internet about Mr. Werb." (*Id.* at 27: 21-24, 28:17-23.) Among other things, she found holiday and trip photographs and learned that Werb had written some books and poetry. (Romano: 175: 1-5.) Weakly then directed Plaintiff to send a letter to Werb's counsel asking for information related to his travel and his books. (Romano, 174:3-8, 175:1-6.) Weakly also decided that ING should require Werb to participate in Independent Medical Examinations (IMEs) and to produce his entire Social Security File. (Weakly, 39:20-40:1, 43:20-25, 44: 7-16; Romano: 219:7-12.) Plaintiff resisted each of these requests. (Weakly, 44:23-45:3.) Plaintiff believed that all of these requests were illegal because "we were holding him to different standards, asking for information that we don't ask from other people. . . . it didn't seem like we were trying to make a decision based on his claim as a whole, . . . it wasn't fair and unbiased." (Romano: 218:25-219:6; Romano Dec., ¶1 .)

Plaintiff challenged Weakly on these requests in many conversations, saying words to the effect that what she was asking was not right and that they could not make these requests to Werb because they don't do this on other claims.  (Romano, 202:12-24, 233:5-10.)

Plaintiff reported her concerns to Corrigan as well. She told him that she did not want to send out the letter that Weakly had ordered her to send. (Corrigan, 52:4-20.) She

also told him that she was "extremely worried" that ING was going to get sued and would have no defense for what they were doing. (Romano: 200:13-201:11.)

During this time frame, Plaintiff felt bullied by Weakly's demands on the Werb case. In personal interactions with Weakly, Plaintiff also felt humiliated, degraded and disrespected by her comments in private and public settings. When she objected to something Weakly was asking her to do, Plaintiff was told "I'm not asking! I'm telling!" or "not open for discussion." (*Id.*) Weakly often ordered rather than asked Plaintiff to do things. (*Id.*) She told Plaintiff: "You need to learn to shut up or do what you're told!" and "Just do it!" (*Id.*) Weakly frequently questioned Plaintiff's abilities and work ethic. (*Id.*) At a team meeting, after Plaintiff made a comment, Weakly said words to the effect, "Nobody knows what you're talking about, let's move on." (*Id.*) Weakly denied making any such remarks. (Weakly, 61:10-64.23.)

Facing pushback from Plaintiff on her demands and desiring to order IMEs for Werb, Weakly scheduled a meeting with Plaintiff, herself, and Clinical Case Manager Paula Doll-Wildenberg ("Doll") for March 28, 2011. (Ex. 80.) Weakly ran the meeting. (Doll, 20:16-18.) Plaintiff felt that Weakly had again treated her in a very disrespectful way at the meeting; it was "not so much a matter of what she said, but how she said it, degrading, rolling her eyes if I spoke, just disrespectful." (Romano,149:22-150:13.) Doll observed that Weakly "can be an aggressive person . . . she has a strong personality so that came across." (Doll, 29:23-30:4.) Weakly also acted "bossy" towards Plaintiff—"she made it clear that she was the supervisor . . . ." (Doll, 30:16-31:3.)

The next day, Plaintiff was forced to sign a letter, drafted by Weakly, and sent to

Werb's counsel. (Ex.E, ING-Romano005241; Romano, Dec., ¶14.) It asked for information about Werb's trips and his writings, and informed him that that an IME was being arranged. (*Id.*) Plaintiff met with Corrigan about her concern that they could not single out a claimant for this type of unusual request, and he agreed. (Romano Dec., ¶15.) Not long after, she overheard Corrigan tell Weakly that she should back off the Werb claim and should not request information from one claimant that she does not seek from others. (Romano Dec., ¶16.) Around the same time, Plaintiff had a conversation with an appeals person, Mary Kay Racette, about what it means to act in bad faith and how to act in a way that the company will not be sued. (Romano Dec., ¶17.)

Sometime after the meeting, Doll told Plaintiff that she had talked with Corrigan about the way Weakly had treated her at the meeting. (Romano Dec., ¶13.) This comment made Plaintiff realize that she hadn't been standing up for herself and it was time to do so. (Romano: 147:18-25.) She "felt things were happening on this claim that could get ING into a lot of trouble, things that were violating the law, I felt like somebody needed to know about it." (Romano, 151:5-14.)

In early April, Plaintiff had a conversation with Kim Boylton, the HR Advisor in ING's Minneapolis office and raised complaints with her about the legality of what was happening in the Werb file. (Romano, 145:24-146:7; Boylton, 6:17-18, 15:15-24; 16:9-21.) Boylton escalated Plaintiff's issue with a communication to the HR Resolution Team. (Ex. 95; Boylton, 17:11-19, 20:10-18.)

Ms. Boylton's email told King that Plaintiff "feels like her manager has been bullying and harassing her." (Ex. 95.) The communication further described Weakly's

negative conduct toward Plaintiff including being held to "different standards," treating her and other team members like children, and making inappropriate remarks about employees. She also discussed the Werb case. Finally, Boylton communicated that Plaintiff "is very afraid of retaliation." (*Id.*)

HR Resolution Consultant Terri Spahn then talked with both Plaintiff and Paula Doll. (Ex. 27, ING-Romano000413-14, 417; Ex. 27, ING-Romano000414.) Plaintiff told Spahn that facing disagreement, Weakly "can get mean," and that the people at the meeting told Corrigan that Weakly was rude, disrespectful and bullying towards Plaintiff. (*Id.*; Romano, 147:5-25.)

Spahn also talked with Paula Doll, who described Weakly as "condescending" to Plaintiff and asking her to do things "outside of their normal process." (Ex. 27, ING-Romano000417.) Doll said that Weakly was "rude to Plaintiff and described the meeting as "hostile" and described Weakly as "aggressive, sometimes in a positive way, but sometimes over the top." (*Id.*; Spahn, 146:10-147:17.)

Romano also sent Spahn an email on April 8, 2011 because Weakly was ordering Plaintiff to request Werb's entire Social Security file. (*Id.*, ING-Romano000414-16.) Plaintiff attached Linda Hatt's email explaining that she had never seen this before.

Spahn "didn't believe there was any bullying behavior going on as [Plaintiff] stated." (Spahn 143:1-11.) "I wasn't really looking to determine truth. I was looking to help their working relationship." (Spahn, 143:12-14.) She talked with Corrigan, who told Spahn that Weakly "is very good technically, but can be very direct and to the point." (*Id.* ING-Romano000417.) Spahn's resolution of the matter was solely to talk with Corrigan

about his need to work with Weakly on her "soft skills" because Plaintiff felt she was being "harsh" and "overbearing." (Spahn, 141:1-144:14.) Spahn and Corrigan were protective of Weakly, observing that the "managers had a difficult job managing a group of employees that knows their job is going away." (Spahn, 146:3-9.) Spahn did not talk to Weakly at all, leaving that to Corrigan. (*Id.*)

Spahn noted in her case report that this "should not be in Kathy's hands. We decided to work with Paula Weakly on her soft skills, Kim Baker and Dave Corrigan can help with that." (Ex. 27, ING-Romano000417.) Spahn expected Corrigan to talk with Baker. (Spahn, 149:17-20.) She also contacted Plaintiff and assured her that Weakly's behavior would stop. (Romano Dec.¶19.) It abated for a short time but then started up again. (*Id.*)

Corrigan understands that aggression could lead to violence. (Corrigan, 178:14-19.) He also understands bullying to be "intimidating someone either physically or verbally"; he understands that entities address bullying to prevent potential physical or emotional damage; and that bullying is something that could become serious." (Corrigan, 36:1-37:6.)

Corrigan did not "investigate" Plaintiff's reports of bullying and harassment. (Corrigan, 59:8-20.) Nor did he keep any record of any of the actions he may have taken. (Corrigan, 46:7-47:12, 48:17-49:8.) He could not remember doing anything specific in follow-up to his discussions with Spahn except talking to some people involved in the Werb claim and meeting. (Corrigan, 77:7-14, 85:20-87:17.) He did not ask any them directly about Plaintiff's reports of bullying and harassing behaviors. (*See e.g., id.,* 77:22-

79:12, 101:1-17.) Asked whether he made any effort to determine whether Ms. Weakly held personal animosity towards Plaintiff, Corrigan responded: "No, I didn't believe there was any personal animosity." (Corrigan, 84:3-8.)

On the morning of April 18, 2011, Plaintiff sent an email to Spahn, pleading for help on behalf of her team that was also being treated disrespectfully by Weakly. The email ended "Please, help us." (Ex. 86.) Spahn viewed the communication as "the same stuff." (Spahn, 150:23-151-22.)

Later in the day, Plaintiff sent Spahn another email. (Ex. 87.) She stated that she is being ordered to do something that violates the Code of Conduct and her ethics, and that has "possible legal implications for ING." (Ex. 87, ING-Romano4433-34.) She stated that she has been ordered to seek an entire Social Security file from a claimant and that this conduct violates ING's obligation not to seek confidential information not needed for review of a file and not to treat one claimant differently than another with respect to information sought—"how would ING ever justify collecting this information for just 1 person, out of the tens of thousands of claims we have handled?" (*Id.*) Plaintiff stated that she is "most definitely not comfortable signing my name" to the request and asks to be removed from the file--"it would definitely be best that this particular claim be handled by someone other than myself." (*Id.*) Attached to this communication is an email that had just been sent to Plaintiff by Weakly, instructing her to draft the letter and not to "send emails on this claimant," meaning she is not to make a paper trail. (*Id.*, ING-Romano004435.)

Spahn forwarded the communication to Corrigan the next day. (*Id.*, ING-Romano004433.) Once Spahn learned from Corrigan that this claim was in litigation, she took no action. (Spahn, 152:3-153:19.) Corrigan understood that Plaintiff's communication with Spahn raised concerns about what Plaintiff thought might be illegal conduct. (Corrigan, 105:15-23.) Corrigan consulted with attorneys and never answered Plaintiff's question or talked with her about her email, but removed her from the Werb case. (Corrigan, 59:15-60:8; 89:5-90:6, 92:12-16; 146:4-150:4; Romano, ¶20.) The case was then assigned to Tonia Hackett. (Corrigan 153:11-13.)

Although removed from the case, Plaintiff continued to experience bullying and harassment from her Weakly. (*See e.g.*, Romano 234:11-25.) In one instance, Ms. Weakly came into a one-on-one meeting with Plaintiff, threw her things on the table and said words to the effect, "so what are we going to bitch about today." (Romano 245:18-8.) Plaintiff experienced similar aggression frequently, including foul language, when she was alone with Weakly. (Romano Dec., ¶23.) Weakly denied this conduct. (Weakly, 61:10-16.) In June of 2011, Weakly criticized Plaintiff for the manner in which she handled a particular claimant call and exaggerated the occurrence of problem calls in the past, without being able to provide examples. (Ex. 27, ING-Romano000425-27; Ex. 31, ING-Romano000119; Romano, ¶21.) In July of 2011, Weakly disciplined Plaintiff for taking unscheduled PTO. (Romano Dec., ¶26; Ex. 31, ING-Romano000119.)

**Romano's 2011 Mid-Term Performance Review and Critique of Weakly**

Within a few weeks of August 25, 2011, Weakly had a one-on-one meeting with Plaintiff about the Mid-Year Performance Review that Weakly had prepared. (Romano,

236:20-238:5, 243:17-244:2; 2011 Performance Review, Ex. 31.) Plaintiff was upset by

the review but did not say anything in the meeting because she believed that her

comments would provoke a verbal attack from Weakly. (Romano, 244:17-245:2.)

Instead, Plaintiff wrote a rebuttal in the "Comments" section at the end of the review.

(Romano:246:15-22; Ex. 31, ING-Romano000118-19.) "I just couldn't let her steamroll

over me; I had to stand up for myself." (Romano 246:20-22.) On August 25, 2011,

Plaintiff electronically submitted the review containing the rebuttal to Weakly. (Romano,

246:23-25.) Plaintiff also sent her review to Spahn and Corrigan. (Ex. 89.) In her rebuttal,

Plaintiff challenged several of Weakly's criticisms as unfair and inappropriate and closed

by stating:

> I feel my manager uses this forum to express her dislike of me personally,
> and to continue her bullying behaviors against me. In the 8 years I have
> worked for ING, I had never felt harassed, bullied, or overly stressed until
> working for this manager.  I feel she engages in retribution and have little
> doubt she will continue to do so since it appears to go unchecked. I am
> certain her complaints against me will only increase now that I have
> defended myself on this review, but I am done saying nothing for fear of
> reprisal. Fear to speak up is after all, what a bully depends on.

(Ex. 31 at ING-Romano000119.)

**Paula Weakly Assaults Romano**

The reprisal happened immediately. Between 5:15 and 5:30 p.m. that day, Plaintiff

went to Weakly's cubicle to suggest they have a conversation about her comments the

next day. (Romano, 249: 1-13, 251:3-5.) She described what happened next in a

statement she provided to ING. (Ex. 32; Romano 261:22-263:12; *see also* Romano 249:1-

251:9.) When Plaintiff entered the cubicle, Weakly was facing her and had a stack of

three-ring binders and spiral notebooks in her hands. (Ex. 32 at 000005-6;) As recounted by Plaintiff, Weakly "looked at me with hatred and rage in her eyes." (*Id.* at 000006;) Using the stack of binders and notebooks, Weakly "swung them like a baseball bat, striking me full-force on my left ear and left side of my face." (*Id.*) Then Weakly "bolted" past Plaintiff and left the building. (*Id.*)

For several minutes, Plaintiff was dazed and could not hear or form coherent thoughts. (*Id.*) After about five minutes she stopped in the bathroom and saw that she had a very tiny scratch on her face "like a pin prick" that had bled a little. (*Id.*; Romano, 253:3-5, 11-12.) She splashed water on her face and looked for someone to help her because something very wrong had been done to her by an employee. (*Id.*; Romano Dec., ¶27.)

She found Kim Baker, the Head of Operations for the Employee Benefits Division. (Ex. 32 at 000006.) They talked. (*Id.*) Baker told Plaintiff she did not have to come to work the next day. (*Id.*) Baker described Plaintiff as "distraught," "very upset," and "in shock." (Baker, 94:7-95:23.) She was crying, wiped her eyes, and rubbed her left cheek. (Baker, 94:13-19, 98:9-99:8.)

When Plaintiff went back to her desk, her phone was ringing and it was her sister. (Romano, 256:1-2; Freeman Declaration, ¶4-5.) Plaintiff told her what happened and her sister told her to call the police because a crime had been committed and she needed to report it. (Freeman Dec., ¶6.[3]) "She . . . talked sense to me. So as soon as I hung up with

---

[3] Plaintiff's sister, Karen Freeman, is a quality engineer who is trained in safety and injury reporting. (Freeman Dec., ¶3.)

her, that's when I called the police." (Romano, 256:4-12.) While she was waiting, she used her cell phone to photograph her face and Weakly's cubicle, where she saw a notebook lying on the floor. (Ex. 32, ING-Romano000006; Ex. 39 (photos).) The police came to the building and took a report but did not come up to the office because they do not investigate misdemeanors. (Romano, 256:13-257:9.) The report stated that a 5[th] degree misdemeanor assault occurred (Minn. Stat. 609.224: intent to cause bodily harm). Plaintiff went back to Weakly's cubicle, where she saw that the notebook on the floor had a small smudge of what looked like blood and hair on it. (Ex. 32 at 000007.) Plaintiff put the notebook in her bag for safekeeping, (*id.*), and then left the building after a second conversation with Baker, who was leaving at the same time. (Romano 258:23-259:2.) Plaintiff told Baker that she had called the police and showed her that her glasses were dented where she had been hit. (Baker, 173:22-174:14; Ex. 58; Ex. 68C.)

**Aftermath of Assault on Romano**

Experiencing nausea and dizziness on her long drive home (she lived in Turtle Lake, Wisconsin at the time), Plaintiff went to a local emergency room. (Ex. 32 at ING-Romano000007; Freeman Dec., ¶7.) The staff treated her for a head injury/possible concussion, noted "facial and head contusion," took photographs of her face, and prescribed anti-nausea medication. (Ex. 64, ING-Romano000020-22; Ex. 77; Ex. 68 (photos).) Plaintiff returned to a doctor the next day, August 26, 2011, because she continued to experience headaches, nausea and emotional distress. (Ex. 64, ING-Romano000019.)

Over the next several days, Plaintiff experienced not only physical symptoms from the assault, but also significant psychological effects. As she described it, "I was hysterical, vomiting, had a horrible headache . . . . I was emotionally not well." (Romano 262:15-16, 20-21; 335:3-9; *see also* 289:22-290:4.) Plaintiff sought counseling and was diagnosed with PTSD. (Ex. 46; Romano, 292:9-297:24.) Her doctors prescribed no work for three weeks. (Ex. 77; Ex.64; Ex. 48, Romano-Cumberland000015.)

She described the assault as traumatic because "I felt completely at her mercy, like she could have beaten me to death on the floor . . . " (Romano at 355:23-354:14.)

**Paula Weakly's Activities before the Assault**

On August 25, 2011, Paula Weakly had a noon meeting. (Weakly, 83:23.) Right before the meeting she deliberately left a notebook on her desk that she used for her daily activities. (Weakly, 83:21-25.) Then, at 1 p.m. Weakly was interviewed for a new position at ING. (Weakly, 85:19-86:4.) The interview ended about 2 p.m. and Weakly returned to her office. (Weakly, 85:16-17.) She noticed her notebook was missing, and about 3 p.m. she sent some emails trying to track it down, but then moved on to her other tasks for the afternoon. (Weakly, 89:21-24, 94:1-5; Ex. 35.) She received Plaintiff's performance review close to 3:30 p.m., read the comments, forwarded the review to Dave Corrigan, and discussed it with Team Lead, Jill Underhill. (Weakly, 98:2-10; Ex. 41.) She sent out a final email about the notebook at 4:41 p.m. (Weakly, 98:12-14; Ex. 41.) She claims to have left her cubicle sometime after 5:23 p.m. (Ex. 41.)

## POST-ASSAULT FACTS

**Participants in Decision to Terminate Romano**

On the morning of August 26, 2011, Baker reported the assault to HR Resolution

Consultant Emily Babiash. (Baker, 158: 20-159:19; Ex. 58.) The case was assigned to

Terri Spahn for investigation. (Spahn, 23:19-24:16.) Kim Baker claimed to be the sole

decision-maker with respect to the assault, but in consultation with the HR team. (Baker

73:15-23.)

**Workplace Violence Policy**

ING espouses zero tolerance for any kind of workplace violence. (Spahn, 12:22-

23.) Its Workplace Violence Policy states: "Any person who engaged in violent behavior

on ING premises will be removed from the premises as quickly as safety permits and

must remain off the premises pending the outcome of an investigation." (Ex. 9 at

000987; Spahn, 14:4-9, 18:21-19:10; Baker, 47:9-16.)

In their first conversation after the assault, Baker and Spahn did not discuss

Weakly's status during the investigation. (Spahn 28:1-7.)  Security was not informed to

keep Weakly from entering the premises and Weakly was not told to remain off-campus

until the investigation was completed. (Baker 54:6-11.; Spahn 33:18-22.)  Nor was she

told to have no contact with Plaintiff during the investigation. (Spahn 47:12-49:2.)

**Romano's Claim and Information Provided to ING**

Romano provided consistent accounts of the assault as described above orally to

Baker on Thursday, August 25 (Baker, 93:14-100:12, 140:13-20, 141:14-24, Ex. 42),

orally to Spahn on Friday, August 26th (Spahn, 29:3-30:21; Ex. 27, ING-Romano000429)

and in a written statement prepared on Monday, August 29th, and faxed to Spahn on Tuesday, August 30th. (Ex. 32.) Spahn and Plaintiff had another telephone call on Monday, August 30th. Plaintiff indicated in her written statement, that she had a notebook with blood and hair on it and offered to return it to the Company, which she did along with a written communication on September 1st. (Ex. 32; Ex. 31).

Plaintiff also provided Spahn with medical records from the ER on August 25, and her doctor visit on August 26. (Ex. 64.) Spahn's case report indicates another phone conversation with Plaintiff on September 9, 2011 in which Spahn questioned her about the notebook and about the scratch on her face. (Ex. 27, ING-Romano000430.)

On September 14, 2011, Plaintiff provided Spahn with a letter stating that she had been released to return to work on September 19, and also saying that she would be sending her therapist's note, that she had been diagnosed with Post Traumatic Stress Disorder, and that she had ordered the photos from the hospital and would try to mail them to her shortly. (Ex. 77.) ING terminated Plaintiff without receiving or reviewing these materials.

**Weakly's Claim and Information Provided to ING**

Weakly talked on the phone with Spahn on August 26. (Spahn, 36:17-38:7; Weakly, 114:10-116:25.) She denied that she had assaulted Plaintiff and told Spahn that a spiral notebook of hers went missing earlier in the day. (*Id.*) Weakly also prepared a timeline of her activities the afternoon of August 25 that she gave to Spahn on the 26th as well. (Ex. 41.) Spahn's case report does not record any further communications with Weakly. (*Id.*)

Weakly talked with Spahn again the following week and asked whether Plaintiff was still employed. Spahn asked her "what would make you think she wouldn't be?", and Weakly responded "because she made up this entire story." (Weakly 120: 5-11.)

## ING'S INVESTIGATIVE PROCESS

ING's HR Resolution Consultants espouse a process where they "gather all the facts of the case" and then "work with the managers to make a determination on the resolution of the case." (Spahn 13:2-8; 14:21-23; 16:9-12; 17:13-17.) Spahn stated that getting to the bottom of what occurred and understanding the context of what happened are important to resolving cases. (Spahn 13:13-24.) Baker described the need for a thorough investigation of a claim that would include understanding the allegations, documenting them and investigating "at all levels whether the allegations can be proved to be true or false." (Baker 25:1-14.)

### ING'S Bias in Treating the Information Received

Spahn claimed to be following ING's investigative process when she asked Plaintiff, Weakly and Baker to write statements about what they witnessed, which they did, and when she collected Plaintiff's medical records. (Exs. 32, 42, 41.) However, Spahn admitted that, at the beginning of the investigation, she had already determined that she would find a way to deny Romano's claim. This is shown in her response to a question about why the Workplace Violence Policy wasn't implemented:

> Q. Did you have any concern about other employees being impacted by Ms.
>
> Weakly's behavior until the investigation was completed?

A. There were *never* any other concerns about workplace violence. So – and there's no other allegations or reason to believe.

Q. Reason to believe what?

A. Reason to believe that Ms. Weakly, you know, had any violent tendencies. This was a case of, you know, a manager and employee that did not get along in the workplace.

(Spahn, 35:5-15.) (emphasis added.)

Plaintiff sensed Spahn's bias against her from the beginning of ING's investigation of her assault. In contrast to her earlier communications with Spahn in the spring of 2011, where Spahn had been empathetic and kind, Plaintiff experienced Spahn as "mean" and "not open to hearing my side of it. . . . It was like she hated me." (Romano, 308:7-19.) Plaintiff believed she was experiencing retaliation for going against the company: "I'm causing a problem." (Romano, 308:20-309:4.) And in subsequent communications, as discussed above, Spahn continued to interrogate Plaintiff about her claim, particularly with respect to Weakly's notebook. The record shows no similar scrutiny or interrogation of Weakly. (*See e.g.*, Ex. 27, ING-Romano000429-431.)

**ING's Selectivity in its Consideration of the Facts**

**The medical evidence.** Baker asserted that she would address Plaintiff's claim by not considering the veracity of either Plaintiff or Weakly. (Baker, 106:3-11.) Instead, she stated that she would decide the matter solely based on her own observation of Plaintiff on the night of the assault compared to the medical information Plaintiff provided to

ING. (Baker, 88:24-91:19.) She did not examine any photos of the Plaintiff or of the notebook. (Baker, 79:4-5.)

Plaintiff reported to Spahn that she had "swelling," and a "small scratch on her cheekbone." (Ex. 27, ING-Romano000429). The ER doctor who saw Plaintiff on the day of the assault similarly observed that Plaintiff's face had hematomas (bruises), and "a subtle, 2 cm, superficial abrasion to the left zygomatic arch region." (Ex. 64, ING-Romano 000021.) The doctor who examined Plaintiff the next day stated that besides "ecchymosis" (bruising) there were "some very subtle superficial abrasions to the left forehead and left cheek area." (Ex. 64, ING-Romano 000019.) Plaintiff also noted in her written statement that the notebook had hair stuck in the spiral wire and a "smear of fresh blood on the back cover." (Ex. 32, ING-Romano000007; Ex. 70.) Baker claims that Plaintiff lied about the assault because she did not see any blood or contusion on Plaintiff's face the night of the assault, and this created inconsistency with the medical reports and what Plaintiff said. (Baker, 104:10-18, 137:18-138:8.)

**ING's Lies about the Medical Evidence.** Also, Baker made contradictory statements about whether Plaintiff's face showed physical evidence of the assault. The day after the assault, Baker told HR Resolution Consultant Babiash that "she "thought she could see some mild swelling on Kathy's cheek, but doesn't know Kathy well enough to be certain." (Ex. 58.) More than a week later, Baker's written statement for Spahn unequivocally stated "There were no marks on Kathy's face, nor had there been any bleeding." (Ex. 42.)

At her deposition Baker initially claimed that her written statement (Ex. 42) was "a hundred percent accurate." (Summary Exhibit 1.) Later in her deposition she admitted that she may have seen some swelling, and she circled the place on photographs of Plaintiff where she actually saw the swelling. (*Id.*)

**The notebook evidence.** Spahn focused on the notebook that had been reported missing and then used in the assault as the basis of a conclusion that Plaintiff lied about the assault. Spahn claimed that Plaintiff's failure to mention the notebook immediately indicated that she was withholding information and therefore lying about the assault. (Spahn, 59:24-61:21.) Other record facts pertinent to the missing notebook are that the only time the notebook could have been stolen from Weakly's office was between noon and 2 p.m. that day; ING did not investigate whether anyone had seen Plaintiff in the vicinity of Weakly's office during the time the notebook allegedly went missing. (Spahn 100:17-21); Weakly's last email about the notebook was sent at 4:41 p.m. that day, indicating that the notebook could have been found before the assault occurred around 5:30 (Ex. 41); and ING gave no weight to the fact that it could not prove that the notebook was not just misplaced in Weakly's office at the time of the assault. (Spahn 101:8-102:12.)

**Motivation.** Neither Spahn nor Weakly considered motivation as a factor to consider in addressing Plaintiff's claim. It is undisputed that Weakly had read Plaintiff's comments in her performance review before the time of the assault. (Spahn 38:22-25.) Neither took into consideration whether the criticisms could have triggered the assault. (Baker 104:4-9; Spahn 123:7-23.) Nor did they consider the section of Plaintiff's

statement where she states that she believes that the assault was the culmination of

ongoing retaliation since she reported to HR and Dave Corrigan that Weakly had ordered

her to take actions on a claim that were illegal and violated ING's Code of Conduct. (Ex.

32; Spahn 72:9-14.) Spahn dismissed the report as "something that, you know, happened

back in April." (Spahn 73:3-74:9.)

**ING Completely Insulated Its Decisionmaker from the Actual Evidence Except for Her Own Observations**

Baker did not review any of the statements written by persons who had knowledge

related to the assault and did not review the medical records. (Spahn 62:5:5-63:3; Baker

166:5-10.) Spahn relayed the claimed relevant facts to Baker. (Spahn 63:9-16.) Baker

claims to have relied completely on the information provided to her by Spahn, plus her

observation of the Plaintiff on the night of the assault. (Baker 26:1-27:1, 60:2-5; 89:7-11.)

Baker's sole documentation of her decision that Plaintiff had lied was a single piece of

paper with a few handwritten notes. (Baker 105:22-108:24, Ex. 55.)

**ING's Termination of Romano**

ING terminated Plaintiff on September 19, 2011. (Romano, 301:12-302-16.)

Spahn prepared the talking points and she and Baker were on the termination call.

(Spahn, 126:24-127:15; Baker, 211:16-18; Ex. 69.) Romano was told that they believe

she fabricated the assault and that she has "not provided any additional information to

support [her] claim."(Ex. 69.) Underlying their belief that her allegation is not true was

her possession of the notebook after the assault, and the disparity between what Baker

saw that night and Plaintiff's claim that she had a laceration on her face. (*Id.*)

Baker unequivocally admitted that Weakly would have been terminated instead of

Plaintiff if she had admitted that she assaulted Plaintiff. (Baker, 212:1-5.)

## ARGUMENT

### I.   Summary Judgment Standard

To prevail over a motion for summary judgment, a plaintiff is simply required to

present admissible evidence that creates a genuine fact issue as to the elements of her

claim. Fed. R. Civ. P. 56. The moving party bears the burden of showing that the

material facts in the case are undisputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).

### II.   Genuine Issues of Fact Require a Jury to Decide Plaintiff's Whistleblower Claims

Plaintiff claims that she was terminated in retaliation for reporting violations of

ERISA to ING in its handling of the Werb claim and for reporting a criminal assault to

ING and the police. Plaintiff has adduced facts sufficient to make out the elements of

these claims under the Minnesota Whistleblower Act ("MWA"). The MWA protects

employees who in good faith report a violation or suspected violation of any federal or

state law or rule to their employer or to a law enforcement official. Minn. Stat. §181.932.

Retaliation claims under the MWA may be proven by direct evidence showing that "an

illegitimate criterion actually motivated the adverse employment action." *Griffin v. City*

*of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Retaliation may also be proved under

the familiar *McDonnell Douglas* scheme. *See McGrath v. TCF Bank Sav., FSB*, 502

N.S.2d 801, 805 (Minn. Ct. App. 1993). In that instance, a plaintiff first establishes a

prima facie case by showing (1) protected conduct, (2) adverse employment action, and (3) causal connection. *Lewis v. Heartland Inns of Am. LLC*, 591 F.3d 1033, 1042 (8th Cir. 2010). Then the employer must articulate a legitimate, non-retaliatory reason for the action. *Grey v. City of Oak Grove*, 396 F.3d 1031, 1035 (8th Cir. 2005). After that, a plaintiff may prevail by showing that "the legitimate, nonretaliatory reasons articulated by [her employer] were not the true reasons for discharge, but merely a pretext for retaliation." *Id.* Finally, circumstantial evidence is sufficient to give rise to an inference of retaliation. *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995).

A.   A Jury Must Decide Plaintiff's MWA Claim Based on Plaintiff's Report of Weakly's Criminal Assault

A reasonable juror could find that Plaintiff reported Weakly's criminal assault to her employer and to the Minneapolis police and was terminated because of that report.

1.   *Genuine Issues of Fact Exist that Plaintiff Has Established a Prima Facie Case of Retaliation for Making Reports of Criminal Assault*

With respect to the "report" prong of a prima facie case, Defendant only challenges whether good faith has been shown. It has.

Plaintiff directly testified that she intended to expose an illegality when she reported Weakly's battery to the police. Her sister reminded her that a criminal act had been committed that should be reported, and Plaintiff responded. "She . . . talked sense to me. So as soon as I hung up with her, that's when I called the police." (Romano, 256:4-12. Plaintiff would have had no reason to call the police other than to report an illegality – in this case a criminal assault.

Plaintiff's report to ING also was in good faith to report an illegality. Plaintiff recalls two things from the time she was assaulted to the time she ended up in Kim Baker's office: first that she needed help, and second, that she needed to report that something very bad had happened to an employee at the hands of another employee. (Romano Dec., ¶27.) Defendant's characterization of Plaintiff's conduct as a "self-interested effort to report a workplace conflict with her supervisor" is completely off-base. Plaintiff's performance was exemplary and she had no need to use a report as a means of protecting herself from any type of disciplinary action. Besides, if she wanted to cause trouble for her supervisor, there would be far less complicated and painful ways to do that. Certainly, if any credence is given to this theory, it is a question for a jury to decide.

Finally, regardless of Plaintiff's dazed mental state on the evening of August 25, 2011, she showed an ongoing willingness to proceed with reporting the criminal incident to the Human Resource Consulting Team on the days following the assault. This confirms that her report to her employer was for the purpose of reporting an illegality and therefore in good faith.

Defendant challenges whether the causal connection prong is established. Indeed, Plaintiff can make the argument that it is established with direct evidence. In its termination talking points (Ex. 69), ING told Plaintiff that she was terminated *because* she reported that Paula Weakly assaulted her, thereby directing establishing the causal connection. Of course, the Defendant will argue that they terminated Plaintiff because the report she made was *fabricated*, but that establishes ING's business justification.

Defendant's argument fails to show that no issues of fact exist as to ING's motivation. Defendant argues that Baker would not retaliate because she would not want to expose the company to potential significant liability for any future workplace violence. This argument is undercut by the facts that Baker did not follow the company's workplace violence policy when the assault was reported, and by Spahn's testimony that, from the start, she did not believe Weakly had any violent tendencies. (Spahn, 35:5-15.)

Defendant also argues that Baker had no basis for retaining Weakly rather than Plaintiff. A jury could find that a company like ING would prefer to retain a manager who is responsible for a large project.

If the Court does not accept the termination reason as direct evidence of causality, then genuine issues of fact exist requiring the question to be determined by the trier of fact.

2. *Genuine Issues of Fact Exist that Defendant's Business Justification is a Pretext for Retaliation*

Defendant essentially argues that even if ING terminated the wrong person, the Court should give deference to its business decision to fire Plaintiff and retain Weakly. No deference is warranted, particularly in summary judgment, because compelling and undisputed evidence creates questions of fact that ING engaged in a sham investigation that had a preordained result of protecting Weakly over Plaintiff. "An employer cannot use the 'objective' nature of its proffered criteria for personnel decisions to insulate itself from skeptical inquiry by the trier of fact." *Neufeld v. Searle Laboratories*, 884 F.2d 335, 340 (8th Cir. 1989); *see also Lackey v. Biomet Inc.*, 1:09-CV-363 JD, 2011 WL 3101575

*12 n.15 (N.D. Ind. July 25, 2011) (stating that the question is not whether the reason is "well-reasoned, wise or accurate," but rather "whether the employer's reason is honest"); *Delaria v. American General Finance, Inc.*, 998 F. Supp. 1050, 1064 (S.D. Iowa 1998) ("[W]here other evidence corroborates a [retaliatory] reality, an incorrect or unfair decision [by an employer] can be used as proof to defeat a motion for summary judgment.") Accordingly, where the facts suggest that the business decision is not true, or a pretext for retaliation, that business decision must be tested and is not an appropriate basis for a grant of summary judgment.

There are compelling facts, many of which are undisputed, on which a jury could find that Defendant's reason for terminating the Plaintiff is not the true reason and a pretext for retaliation. Most compelling is the fact that the key decisionmaker lied about what she observed the night of the assault and then used that lie – the claimed absence of physical evidence of injury– to ignore all of the evidence corroborating Plaintiff's truthtelling. (Summary Exhibit 1.) The medical evidence consistently described the abrasion on Plaintiff's face as subtle and small; Baker observed that Plaintiff was crying and rubbing her face, making it likely that a small bit of blood would disappear and a very small break in the skin would not be seen. There is no inconsistency there. Proof that an explanation is unworthy of credence "may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is . . . cover[ing] up a [retaliatory] purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000.)

The selectivity with which Defendant decided what evidence to emphasize and what avenues to investigate also casts a dark shadow on its motives and demonstrates genuine issues of fact. Yes – Plaintiff picked up the notebook, but the timeline and reality of how things can get misplaced in an office result in an equally plausible conclusion that the notebook was either found by Weakly after 4:41 p.m. or was there all along. Moreover, if Plaintiff had made up the very complicated scenario that Defendant's theory requires, why would she forget she had the notebook? A jury could conclude that the notebook would have been front and center from the beginning under Defendant's claimed scenario.

Plaintiff recounted the assault the same way every time she talked about it. Her injuries were documented and serious. The emotional trauma that was diagnosed as PTSD was genuine, even to Baker. A jury must decide whether a long-time loyal and conscientious employee could or would maintain the type of charade that Defendant claims has occurred for such a lengthy period of time.

Another reason why a jury must evaluate Defendant's investigation decisions is that what ING did was not consistent with what both Spahn and Baker testified was necessary for a reasonable investigation. Spahn testified that she believed it was important to understand the context of what happened in order to resolve cases and to document investigations. (Spahn, 13:13-24.) Baker stated that a situation such as the investigation of Plaintiff's reported assault required a "thorough investigation" that included documentation and examination "at all levels whether the allegations can be proved to be true or false." (Baker, 25:1-14.)

Given these statements it defies reason that, given Weakly reputation as being aggressive and the history of the interactions between Plaintiff and Weakly, that Defendant would not have considered motivation in its investigation of the assault. An employer's departure from its own policies and procedures gives rise to "negative connotations" lending support to an inference of improper motive. *See e.g. Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 (8th Cir. 1998). A jury could find it evidence of pretext that the company did not consider whether Weakly was carrying a grudge because of Plaintiff's refusal to do her bidding in a high-dollar case, or because Plaintiff's mid-year review threatened Weakly's ability to get a new job at ING, such as the job for which she had interviewed that very afternoon.

Besides the evidence cited above, Defendant's failure to follow its Workplace Violence Policy, and the lack of transparency and documentation of the actual assault investigation and termination decision further support denial of summary judgment.

Finally, to make the termination decision that ING made, its investigator and decisionmaker would have to accept and believe that Plaintiff, who was trusted with dispensing millions of dollars of company money, planned a very elaborate ruse to get her supervisor fired. For this ruse to work, Plaintiff would have had to know that Weakly was going to leave her notebook in her office for the two hours between noon and 2 p.m. on August 25; that she would be able to take it from Weakly's cubicle in a public space with many employees; that she would hit herself in the face with it; that she would act out serious distress that appeared genuine to Baker; and continue that acting through an ER and doctor visit; and further dupe a psychologist into treating her for PTSD.

Plaintiff has met her burden at summary judgment.

        3.     *Alternatively, Plaintiff can establish a genuine issue of fact as to pretext under a "cat's paw" theory.*

Summary judgment is also improper because at least a question of fact exists that Weakly used ING decisionmakers as her "cat's paw" to retaliate against Plaintiff for reporting her criminal assault (and for that matter, for reporting Weakly's suspected illegalities in handling the Werb claim).

The United States Supreme Court has held: "if a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [antiretaliation statutes]." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011). The Supreme Court further held that a claimed neutral investigation (or reasonable business investigation) does not mitigate an employer's liability:

> We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory [or retaliatory] animus that was intended to cause, and did in fact cause, an adverse employment decision.

*Id.* at 1193.

The cat's paw theory clearly applies here. Paula Weakly is a manager at ING. By denying that she hit Romano and claiming the incident was fabricated, Weakly had the capability to influence the decisionmaking by Spahn and Baker. Indeed, Baker testified

that Weakly would have been terminated if she had admitted the assault. (Baker, 212:1-5.) Paula Weakly's lie about what actually happened constitutes the quintessential "cat's paw" scenario.  Weakly's lie was intended to get Romano fired—to retaliate against her—because Romano reported her assault to ING and the police (and because Plaintiff complained previously about illegal conduct on Weakly's part). And the lie was a success. Romano was terminated. Further establishing at least a question of fact as to Weakly's motivation, Weakly talked with Spahn the week after the assault, asked her whether Plaintiff was still employed, and claimed that Plaintiff "made up this entire story." (Weakly 120: 5-11.)

Under a cat's paw scenario, which is essentially an agency scenario, ING's business justification defense becomes immaterial. Then the question becomes whether a question of fact exists that Weakly performed an act designed to cause Plaintiff's termination. A jury could find that she did, making summary judgment inappropriate.

In sum, multiple bases exist on which this Court can and should deny Defendant's motion for summary judgment on Plaintiff's claim that she was terminated for reporting Weakly's criminal assault.

B.    A Jury Must Decide Plaintiff's MWA Claim Based on Plaintiff's Report of ING's Suspected Illegal Treatment of the Werb Claim

A reasonable juror could find that Plaintiff reported suspect illegal treatment of the Werb claim to her employer and was terminated because of that report.

1.   *Genuine Issues of Fact Exist that Plaintiff Has Established a Prima Facie Case of Retaliation for Making Reports of Illegal Treatment of the Werb Claim*

Defendant's first challenge to Plaintiff's claim of retaliation based on her reports of suspected illegal treatment of the Werb claim relies on a misreading of the applicable law. An employee only has to report a suspected illegality. She does not have to prove that the employer actually engaged in the illegal conduct—only that if true, the activity she is alleging would constitute a violation of laws or regulations. "While there need not be an actual violation of law, the reported conduct must at least implicate a violation of law." *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 204 (Minn. 2004).

Defendant does not argue that Plaintiff's reports relating to ERISA—that ING was illegally treating Werb's claim differently from other claims and asking for information not sought from other claimants—would not be violations of law, if true. Defendant's argument in its brief at pages 19-20 that the conduct did not actually violate the law are irrelevant and only prove that Plaintiff made reports of at least suspected illegalities.

Defendant asserts that Plaintiff's reports in relation to the Werb file were too vague to constitute reports. However, in the previous section of Defendant's brief (19-20) it argued that it did not violate the specific laws and regulations underlying Plaintiff's reports. This certainly defeats its vagueness arguments.

Defendant claims that Plaintiff did not cite the specific statutes and regulations about which she was concerned. That is not an MWA requirement. What is required is that she describe the conduct that she believes is illegal, and she did that. *See Abraham v.*

*County of Hennepin*, 639 N.W.2d 342, 354-55 (Minn. 2002) (finding that whistleblower claim need not identify specific law or rule that is violated, only that the employee reported conduct that, if proven, would constitute a violation of a law or rule adopted pursuant to law); *Obst*, 614 N.W.2d at 204. She objected to treating the Werb claim differently than other similar claims and seeking information not sought from others.

Defendant claims that Plaintiff's reports are a subterfuge for protecting herself from consequences of performance problems. This at most shows that there is a question of fact as to whether Plaintiff made "good faith" reports; it certainly does not demonstrate the absence of genuine issues of fact. The record is replete with Plaintiff's multiple efforts to do the right thing, often at peril to her well-being.

Defendant claims that Plaintiff's reports were not made in good faith because she testified that she could be personally liable for the violations she is reporting. First, the entire record shows many occasions where Plaintiff tells Corrigan and Weakly that she is concerned that ING will be sued if they pursue certain investigations. Second, if this type of self-interest were a determining factor, then, for example, any claim of an OSHA violation by a worker would be illegitimate if that violation endangered the worker making the report. This simply is not the law.

Finally, with respect to good faith, Defendant claims that Plaintiff had a duty to report, making her ineligible for MWA protection. If this proposition were true, no ING employee would be protected by the MWA because they are all obligated to follow ING's Code of Conduct. This issue is quite simply resolved: the job description of the Disability Benefits Adjudicator does not include responsibilities for compliance or

reporting illegalities in claims management. (*See* Ex. 10.) Nor was compliance or reporting illegalities included in Plaintiff's far-more detailed explanation of her work responsibilities. (*See* Romano, 52:19-56:25, 57:15-58:5.) *Kidwell v. Sybaritic,* 784 N.W.2d 220 (Minn. 2010), instructs us that the question is whether an employee's job involves investigating and reporting illegal behavior." *Id.* at 228. If it does not, then the duty to report issue is not implicated in "good faith." That is the case here. *See Nelson v. County of St. Louis*, No. A10-676 2011 WL 382630 (Minn. Ct. App. 2013) (finding that registered nurse's filing of vulnerable-adult report is protected by statute).

With respect to the third prong of a prima facie retaliation case, Defendant challenges causality on the grounds that Baker was unaware of Plaintiff's complaints about the Werb claim. This argument does not justify summary judgment for at least three reasons. First, Baker testified that she actually had been apprised of the concerns about retaliation for her Werb reports expressed by Plaintiff in pages 3-4 of her written statement about the assault. (Ex. 32; Baker, 135:22-136:9.)

The second reason why Baker's knowledge is not determinative of this claim is that the cat's paw agency principle also may be applied to this claim, with HR Resolution Consultant Terri Spahn as the manager putting a cat's paw into play. She certainly had knowledge of the reports, and she certainly had the ability to influence Baker's decision. A jury could find that Spahn had the means and motivation, and executed a cat's paw maneuver to achieve her goal of eliminating a troublesome employee.

Third, the cat's paw agency principle may also be applied to this claim with Paula Weakly as the instigator. Defendant may argue that Weakly testified that she was not

aware of any claims made by the Plaintiff. However, circumstantial evidence may be used to show that she had to know about the complaints. For example, Plaintiff's Declaration, cited above, at paragraphs 11, 14-16, and 19, cite several interactions with Weakly that create an inference that Weakly certainly had to know that Plaintiff was making reports to Corrigan and others about her treatment of the Werb claim. As stated above, circumstantial evidence may be used to prove knowledge, means and motivation.

In sum, Defendant has failed to show the absence of genuine issues of fact with respect to the elements of a prima facie case related to the Werb claims.

> 2.    *Genuine Issues of Fact Exist that Defendant's Business Justification is a Pretext for Retaliation with Respect to the Werb Claim*

Plaintiff incorporates here by reference to the argument made above about the business justification defense as it relates to Plaintiff's claim related to her criminal assault. The same arguments apply here, thereby warranting a denial of summary judgment on this claim.

> C.    No Genuine Issue of Fact Supports Defendant's After-Acquired Evidence Defense

ING contends that even if Plaintiff could establish a MWA claim, her damages should be "significantly limited" by the after-acquired evidence doctrine. The after-acquired evidence doctrine is an affirmative defense[4] and, as such, ING bears the burden of establishing each of the defense's essential elements. It has failed to meet that burden.

Under *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995), "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must

---

[4] *See, e.g., Seegert v. Monson Trucking, Inc.*, 717 F. Supp.2d 863, 867 (D. Minn. 2010).

first establish that the wrongdoing was of such severity that the employee in fact would have been terminated [or not hired] on those grounds alone." ING contends that Plaintiff misrepresented that she had a college degree when she was hired, but it has proffered no evidence to support that allegation, and, indeed, the only record evidence is to the contrary. When Plaintiff applied to ING she believed she had a degree. It was only after she was terminated and thinking about seeking an advanced degree that she found out a final course that was supposed to have transferred for her degree was missing. (Romano, 10:1-11:25.)[5] Because ING has not – and cannot—establish that Plaintiff engaged in wrongdoing, let alone severe wrongdoing, it is Plaintiff – not ING—who is entitled to summary judgment on this defense. *See Hall v. USAir, Inc.*, CV 95-3922, 1996 WL 705284 (E.D.N.Y. Nov. 25, 1996) (unintentional, honest mistake does not necessarily violate claimed rule against deliberate falsification of a job application).

Moreover, even if ING could show that Plaintiff's alleged misrepresentation constituted severe misconduct, it has offered no evidence, let alone indisputable evidence, that Plaintiff "in fact would have been terminated [or not hired] *on those grounds alone*." *McKennon,* 51 U.S. at 362-63 (emphasis added). In this regard, "[t]he employer has a 'substantial burden' to show that there is a 'settled' company policy that a particular employee would have 'in fact' been fired based on the alleged misconduct." *Predzik v. Shelter Corp., Inc.*, 05-1063 JRT/FLN, 2006 WL: 2794368 (D. Minn. Sept. 27, 2006). The court must look to the employer"s "actual employment practices" and not merely the

---

[5] Plaintiff disclosed this information at her deposition when asked if there were any changed needed to her interrogatory answers. If she had intended to misrepresent her educational status, she would not have voluntarily changed her discovery response.

standards articulated in its employment manuals. *Sellers v. Mineta,* 358 F.3d 1058, 1064 (8th Cir. 2004). *See also Jones v. Bd. of Trustees of Cmty. College Dist. No. 508,* 75 F. Supp.2d 885 (N.D. Ill. 1999).

ING rests its defense solely on an Affidavit of Kim Boylton, a Human Resources advisor, which states only that the claimed misrepresentation would be "sufficient" to prevent ING from hiring an applicant, and/or result in termination if discovered after hire. This is a far cry from conclusive evidence that Plaintiff would, in fact, not have been hired or would have been terminated based on her alleged misrepresentation. *See Predzik,* 2006 WL 2794368, at *5 (finding question of fact as to "settled" policy where employee handbook was equivocal, even with testimony that employees had been fired); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047-48 (7th Cir. 1999). If anything, the record in this case undercuts the conclusion that Plaintiff's alleged "misrepresentation" was material to ING's hiring decision or her ongoing employment. There is, for example, no evidence that ING ever sought a transcript or a copy of a diploma in processing Plaintiff's application for employment. In fact, Plaintiff's position at ING did not require a college degree if the person had sufficient experience. (Ex. 10.)

At the very least, the existence of obvious issues of material fact defeats summary judgment. *See Predzik*, 2006 WL 2794368 (denying summary judgment where evidence does not show "settled" company policy)[6].

---

[6] ING's after-acquired evidence defense should be independently rejected for another reason. Plaintiff disclosed the information about her college education in her deposition on August 30, 2012. Discovery did not end until November 1, 2012. Yet, ING never sought to amend its answer to the Complaint nor did it disclose its intent to assert an

### III.    Plaintiff's Battery Claim Must Be Tried by a Jury

"Battery is an intentional, unpermitted offensive contact with another. *Johnson v.
Morris*, 453 N.W.2d 31, 40 (Minn. 1990). The two elements of battery are intent and
offensive contact. *Id.* (citing *Schumann v. McGinn*, 240 N.W.2d 525, 529 (Minn. 1976)).
Under the doctrine of respondeat superior, "an employer is vicariously liable for the torts
of an employee committed within the course and scope of employment." *Schneider v.
Buckman*, 433 N.W.2d 98, 101 (Minn. 1988). But "an employee's act need not be
committed in furtherance of his employer's business to fall within the scope of his
employment" for purposes of respondeat superior. *Fahrendorff v. N. Homes, Inc.*, 597
N.W.2d 905, 910 (Minn. 1999). An employer is liable for an employee's intentional
misconduct if "(1) 'the source of the [tort] is related to the duties of the employee,' and
(2) 'the [tort] occurs within work-related limits of time and place.' " *Id.* (quoting *Lange v.
Nat'l Biscuit Co.*, 297 Minn. 399, 404, 211 N.W.2d 783, 786 (Minn. 1973)).

In determining whether an employee's intentional misconduct is within the scope
of employment, the employee's acts must be "foreseeable, related to and connected with
acts otherwise within the scope of employment." *Frieler v. Carlson Mktg. Grp., Inc.*, 751
N.W.2d 558, 583 (Minn. 2008). Furthermore, whether an employee's acts are foreseeable

---

after-acquired evidence defense until it filed its memorandum in support of summary
judgment. ING's untimely assertion of this affirmative defense has prejudiced Plaintiff
by depriving her of the opportunity for discovery. On this ground, alone, the court may
refuse to consider the defense. *See e.g. Sayre v. Musicland Group, Inc.*, 850 F.2d 350,
354 (8th Cir. 1988) (failure to plead affirmative defense generally results in a waiver of
that defense and its exclusion from the case."

is a question of fact. *Id.*; *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1982).

After Plaintiff decided to affirm the second Werb claim, she saw that Weakly's attitude toward her changed. She experienced bullying from Weakly that initially left her feeling humiliated, degraded and disrespected. However, those initial feelings escalated to include feelings of fear. Plaintiff reported, and management was well aware of, the escalation in Weakly's behavior toward Plaintiff. Despite management's unwillingness to address Weakly's aggression toward Plaintiff, that escalation, as detailed below, creates a genuine issue of material fact on the issue of foreseeability.

Management knew about Weakly's general aggressive nature and specifically, knew about Weakly's aggression toward Plaintiff. When Plaintiff decided it was time to stand up for herself and contact HR, she made it clear to Boylton that "her manager has been bullying and harassing her." (Ex. 95.) Critically, Boylton communicated to King that Plaintiff "is very afraid of retaliation." (Ex. 95.) Spahn collected additional information. For example, Doll, a manager, described Weakly as "bossy" towards Plaintiff, and acknowledged that Weakly "can be an aggressive person . . . ." Plaintiff told her that if someone disagrees with Weakly, "she can get mean," and that the people at the meeting told Corrigan that Weakly was rude and disrespectful to Plaintiff and tried to bully her. (*Id.*; Ex. A, 147:5-25.) Doll told Spahn that Weakly was "condescending" to Plaintiff at the meeting and was asking her to do things "outside of their normal process. (Ex. 27, ING-Romano000417.)

Corrigan testified that he understands that aggression could lead to violence. (Corrigan, 178:14-19.) He also understands bullying to be "intimidating someone either physically or verbally"; he understands that entities address bullying to prevent potential physical or emotional damage; and that bullying is something that could become serious." (Corrigan, 36:1-37:6.)

Despite Plaintiff's repeated reports of Weakly's aggression and hostility toward her, and corroboration from colleagues, Spahn chose to turn a blind eye. In fact, she admitted she was not looking for the truth, just to help their working relationship. (Spahn 143:12-14.) Like Spahn, Corrigan, even understanding that aggression can lead to violence, did nothing in response to Plaintiff's reports. Simply because ING failed to believe Plaintiff's reports or investigate her claims in any meaningful way, does not mean the battery was not foreseeable.

It is no surprise that Weakly physically attached Plaintiff shortly after she received Plaintiff's Mid-Year Performance Review. (Ex. 31.) Plaintiff challenged several of Weakly's criticisms as unfair and inappropriate for a formal review and closed by stating that she would no longer keep silent but would stand up to Weakly's bullying behavior. The record is replete with facts demonstrating the escalation of Weakly's behavior toward Plaintiff and management's knowledge of that behavior thereby creating a genuine issue of material fact as to foreseeability.

Defendant raises, albeit in a footnote, the assault exception to the Workers' Compensation Act. However, an employer who intentionally and maliciously injures an employee engaged in employment is precluded from interposing the Workers'

Compensation Act ("WCA") exclusivity defense. *See Boek v. Wong Hing*, 231 N.W. 233 (Minn. 1930); *Kaess v. Armstrong Cork Co.*, 403 N.W.2d 643, 644 (Minn. 1987). Plaintiff is able to present material facts demonstrating a "conscious and deliberate" intent to inflict injury, which brings her battery claim within the intentional tort exception to the exclusive remedy provision of the WCA. *See Kaess*, 402 N.W.2d at 645. "Intent may be inferred from all the facts and circumstances, such as exhibitions of anger, threats, gestures and other conduct." *Richey v. Magnuson*, No. A09-2224, 2010 WL 29000335, at *2 (Minn. Ct. App. July 27, 2010) (citing *Dahlin v. Fraser*, 478, 288 N.W. 851, 853 (Minn. 1939)).

In *Boek v. Wong Hing*, the court applied the intentional injury exception to the exclusive remedy of the WCA where the employer swung a heavy broom handle at the employee. 231 N.W. 233 (Minn. 1930). The court found that to allow an employer to hide behind the WCA after a willful assault would be a "perversion of the purpose of the act." *Id.* at 233-34. Summary judgment is inappropriate here because the record demonstrates that Weakly consciously and deliberately intended to injure Plaintiff. *See Gunderson v. Harrington*, 632 N.W.2d 695, 703 (Minn. 2001) (explaining that summary judgment requires creating a genuine issue as to whether [the employer] consciously and deliberately intended to injure [the plaintiff].").

The record contains material facts that Weakly intentionally injured plaintiff by striking her with a stack of three-ring binders and spiral notebooks. Furthermore, Plaintiff's deposition testimony unequivocally demonstrates her belief that the assault was committed with the intent to injure Plaintiff. Weakly's conduct demonstrates

"conscious and deliberate" intent to inflict injury, which brings her battery claim within the intentional tort exception to the exclusive remedy provision of the WCA.

Viewing the evidence in the light most favorable to Plaintiff, genuine issues of material fact exist precluding summary judgment on Plaintiff's battery claim.

## IV.    Plaintiff's Negligent Supervision Claim Must be Tried to a Jury

Negligent supervision is the failure of an employer "to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons." *Cook v. Greyhound Lines, Inc.*, 847 F.Supp. 725, 732 (D. Minn. 1994). In negligence cases, "foreseeability" means a level of probability that would lead a prudent person to take effective precautions. *Fahrendorff*, 597 N.W.2d at 912. If the abusive behavior was objectively foreseeable, then the inquiry must focus on whether the employer took reasonable precautions, beforehand, to prevent the abuse. *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 911 (Minn. 1983). The elements of a claim of negligent supervision are a duty of care, which was breached by negligence in supervision, and which proximately caused damage. *Ponticas*, 331 N.W.2d at 911-12.

Negligent supervision derives from the doctrine of *respondeat superior* so the claimant ultimately will need to prove that the employee's actions occurred within the scope of employment in order to succeed on this claim. *Id.; Yunker*, 493 N.W.2d at 424. Since the basis of liability it that the tortious act is committed in the scope of employment, whether the employer is at fault is immaterial. *Bruchas,* 553 N.W.2d at 443 (quoting *Oslin v. State*, 543 N.W.2d 408, 414 (Minn. App. 1996) (emphasis added)).

There is no dispute that Weakly was acting in the scope of her employment during the course of her dealings with Plaintiff and at the time of the battery.

At least a genuine issue of fact exists whether ING breached a duty of care in supervising Paula Weakly. In April of 2011 Plaintiff brought very specific allegations to the HR Resolution Team, Kim Boylton and Terri Spahn that Weakly was bullying and harassing her. Plaintiff's colleagues concurred that Weakly is condescending, rude, and aggressive, sometimes over the top, and that Weakly has specifically targeted Plaintiff for this mean behavior.

Instead of tackling the problem head-on, and despite corroborated complaints about Weakly's behavior, Spahn "didn't believe there was any bullying behavior going on" and admitted she wasn't looking for truth, just to help their working relationship. (Spahn 143:12-14.) She passed the ball to Corrigan to work with Weakly. Like Spahn he did nothing directly, not believing that Weakly held any personal animosity towards Plaintiff. And indeed, Weakly herself testified that no concerns had been brought to her. Given these facts, and contrary to Defendant's assertion, a dispute exists whether the laissez-faire pass-the-ball approach used by ING, meets the required standard of ordinary care. ING did not believe Plaintiff's reports in the first place, did not seriously investigate her reports, and did not intervene in any meaningful way when corroborated complaints of bullying were made. A jury certainly could find on these facts that ING has failed its duty of care to employees like Plaintiff.

Defendant similarly claims that the alleged battery was not foreseeable. Corrigan himself acknowledged that bullying (and harassment for that matter) has a potential

physical aggression component, and ING knew that aggressiveness was one of Weakly's well-known traits. Certainly a jury could find that once warned, ING was on notice that Weakly's bullying behavior was a problem for at least some of its employees. *See e.g.,* *Mandy v. Minnesota Min. & Mfg.*, 940 F. Supp. 1463, 1471 (D. Minn. 1996) (finding that once harassment has been reported, continued harassment is foreseeable to defendant); *see also Williams v. Mesabi Reg. Med. Cen., Inc.*, 1999 WL 618851, at *7 (Minn. Ct. App. Aug. 17, 1999) (finding an issue of fact for the jury on foreseeability when the employer was on notice from an earlier report of assault).

A jury could readily find that ING failed to exercise reasonable care under these facts. Viewing the facts in the light most favorable to Plaintiff, despite her repeated reports of aggression and hostility toward Plaintiff, ING did nothing. It never seriously investigated Plaintiff's claims and ignored her reported fear of retaliation. ING failed to address Weakly's aggressive behavior despite corroborating evidence of Weakly's bullying and harassing nature from other ING employees. The facts in the record, at a minimum, create a genuine issue of material fact on negligent supervision.

**CONCLUSION**

Based on the foregoing, Plaintiff Romano respectfully asks this Court to deny

ING's Motion for Summary Judgment.

HALUNEN & ASSOCIATES

s/Susan M. Coler
Susan M. Coler, No. 0217621
1650 IDS Center
80 South Eighth Street
Minneapolis, MN  554402
Telephone:  612.605.4098
Fax: 612.605.4099
*Attorneys for Plaintiff*