# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Katherine Romano,<br><br>    Plaintiff,<br><br>v.<br><br>ING ReliaStar Life Insurance,<br><br>    Defendant. | Case No. 12-cv-0137 (SRN/JJK)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Susan M. Coler and Clayton D. Halunen, Halunen & Associates, 1650 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Plaintiff.

Joseph G. Schmitt and Lisa M. Schmid, Nilan Johnson Lewis PA, 120 South Sixth Street, Suite 400, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

This matter is before the Court on Defendant's Amended Motion for Summary Judgment, [Doc. No. 47], which was heard on March 27, 2013. In her Amended Complaint, Plaintiff asserts claims of retaliation, battery, and negligent supervision against her former employer, ING ReliaStar Life Insurance.[1] (Am. Compl. and Jury Demand at 8-10 [Doc. No. 14].) For the reasons that follow, the Court grants Defendant's summary judgment motion in part and denies it in part.

Also before the Court are Plaintiff's Objections to Magistrate Judge Jeffrey J.

---

[1] On February 14, 2013, Plaintiff withdrew her claims for defamation and negligent infliction of emotional distress. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 2 n.1 [Doc. No. 50].)

Keyes's November 26, 2012, Order [Doc. No. 29], which denied Plaintiff's Motion to Amend Complaint to Claim Punitive Damages [Doc. No. 18]. (Pl.'s Objections to Order of Magistrate Judge Denying Mot. to Am. Compl. to Claim Punitive Damages [Doc. No. 31].) After reviewing the Magistrate Judge's Order for clear error, the Court affirms the Order for the reasons set forth below.

## II.  BACKGROUND

### A.  Ms. Romano's Work History, Position, and Performance at ING

Defendant ReliaStar Life Insurance Company ("ING") provides group life, disability, and medical stop-loss insurance coverage to employers or affinity organizations. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. at 3 [Doc. No. 42].) As part of that business, ING formerly managed claims for disability benefits arising out of the policies it sold. (Id.)

Plaintiff Katherine Romano ("Romano") began working at ING in June 2003. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 2 [Doc. No. 50].) As a Senior Disability Benefits Adjudicator ("DBA") on ING's Long-Term Disability ("LTD") team, Ms. Romano analyzed claims for long-term disability benefits to determine if the claimants were eligible for benefits. (Romano Dep. at 52-56 [Doc. No. 51-7].) From March 2010 to her termination, Ms. Romano reported to LTD Supervisor Paula Weakly.[2] (Pl.'s Mem. of

---

[2] Ms. Weakly began working at ING in 2004 as an Excess Risk Analyst. (Weakly Dep. at 10 [Doc. No. 51-8]; Corrigan Dep. at 17 [Doc. No. 51-4].) In March 2010, she was hired internally for the time-limited position of Supervisor in Long-Term Disability. (Pl. Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 4 [Doc. No. 50].) Ms. Weakly reported to David Corrigan, the Director of the Disability Claims Department, and Mr.

Law in Opp'n to Def.'s Mot. for Summ. J. at 2 [Doc. No. 50].)

To adjudicate a claim, Ms. Romano first analyzed the policy to determine whether the claimant was eligible for coverage. (Romano Dep. at 54-55.) If the insured was eligible for coverage, Ms. Romano then analyzed whether the claimant met the policy's definition of disability. (Id. at 55-56.) Ms. Romano gathered all information relevant to the determination, using the claimant's medical records, internet research, and independent medical examinations. (Id. at 55-58, 215-218; Corrigan Dep. at 66, 120-121.)

ING required and trained DBAs, including Ms. Romano, to review all claims fairly and thoroughly. (Romano Dep. at 161-62; Corrigan Dep. at 25, 33-34; Racette Dep. at 33-35 [Doc. No. 51-6].) A fair and thorough review required DBAs to detect and resolve "red flags" that might trigger concern that the claimant might not meet the disability definition. (Romano Dep. at 163-65.) It was not uncommon for other claims employees—such as the Clinical Case Management team, team leads, supervisors, or managers—to uncover or investigate red flags, particularly on large or complex claims. (Corrigan Dep. at 30-31, 57; Weakly Dep. at 28-29.)

Ms. Romano routinely received scores of "meets" or "exceeds" expectations on her performance reviews. (Romano Decl. ¶ 4 [Doc. No. 57]; Corrigan Dep. at 51.) Nonetheless, while under Ms. Weakly's supervision, Ms. Romano had several performance issues. (Romano Dep. at 208-13, 229-30; Exs. 28 and 29 to Romano Dep. [Doc. Nos. 46-14, 46-15]; Weakley Dep. at 15-18.) As early as January 2010, Ms. Weakly needed to

---

Corrigan reported to Kim Baker, Head of Operations. (Exs. 51, 52 to Baker Dep. [Doc. Nos. 46-27, 46-28].)

monitor Ms. Romano's personal cell phone use during work hours. (Weakley Dep. at 15-17; Ex. 28 to Romano Dep. [Doc. No. 46-14].) Ms. Romano also struggled with attendance, and in July 2011, Ms. Weakly issued a verbal warning to Romano after she reached six "occurrences" under ING's Attendance Policy. (Ex. 29 to Romano Dep. [Doc. No. 46-15].) Further, Ms. Weakly provided Ms. Romano constructive criticism on handling difficult claimant calls after at least two claimants requested a new DBA. (Ex. 27 to Romano Dep. at 12-15 [Doc. No. 46-13].)

**B.     The Werb Claim**

In September 2010, ING asked Ms. Romano to review claimant Michael Werb's file to determine whether his claim for long-term disability should be approved. (Romano Dep. at 151-52.) Injured in a work-related car accident, Mr. Werb alleged total disability from his occupation due to back strain and muscle problems that affected his ability to sit and concentrate. (Id. at 171-72; Weakly Dep. at 38-39.) Another ING DBA and the ING Appeals Department had denied Mr. Werb's claim, and the claim was in litigation. (Romano Dep. at 155-59; see Werb v. ReliaStar Life Ins. Co., 847 F. Supp. 2d 1140 (D. Minn. 2012).)

In November 2010, Ms. Romano approved the first part of the claim from October 28, 1998 through January 1, 2007. (Romano Dep. at 152; Pl.'s Ex. 83 [Doc. No. 55-2].) Ms. Romano sent the approval letter without consulting anyone, and ING paid the benefits. (Romano Dep. at 152-53, 155.) Ms. Weakly expressed mild surprise when she learned of the approval because of the previous denials, but she did not become angry with or punish Ms. Romano. (Id. at 166; Weakly Dep. at 23.)

4

In early 2011, Ms. Romano was asked to review the Werb file again, this time for the period from 2007 and onward. (Romano Dep. at 152.) Ms. Romano concluded from her review that the claim should be paid. (Id. at 166-67.) After Ms. Romano informed Ms. Weakly of her conclusion, Ms. Romano was stopped from approving the claim and Ms. Weakly became involved with the Werb file. (Id. at 169.)

Ms. Weakly reviewed Mr. Werb's recently submitted information, noting inconsistencies to be addressed before approving or denying the claim. (Weakly Dep. at 28-29.) Based on these inconsistencies, Ms. Weakly asked Ms. Romano to send Mr. Werb a letter ("the Werb letter") requesting additional information that was relevant to his claim. (Romano Dep. at 169, 174-75.) Ms. Weakly also decided that Mr. Werb should be required to participate in an Independent Medical Examination and produce his entire Social Security File. (Id. at 219; Weakly Dep. at 39-40, 43-44.) Ms. Romano resisted each of these requests. (Weakly Dep. at 44-45.) Ms. Romano believed that all of these requests were illegal because "we were holding him [Werb] to different standards, asking for information that we don't ask from other people . . . it didn't seem like we were trying to make a decision based on this claim as a whole . . . it wasn't fair and unbiased." (Romano Dep. at 218-19.) Ms. Romano reported her concerns to David Corrigan, telling him that she did not want to send the Werb letter per Ms. Weakly's request. (Corrigan Dep. at 52.) Ms. Romano also told Mr. Corrigan that she was "extremely worried" that ING was going to get sued and would have no defense for what they were doing. (Romano Dep. at 200-201.)

During this time frame, Ms. Romano felt bullied by Ms. Weakly's requests on the Werb file. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 7 [Doc. No. 50].) In

personal interactions with Ms. Weakly, Ms. Romano felt humiliated, degraded, and disrespected by her comments in private and public settings. (Id.) Ms. Romano alleged that when she objected to something Ms. Weakly asked her to do, Ms. Weakly would respond, "I'm not asking! I'm telling!"; "not open for discussion"; "you need to learn to shut up or do what you're told!"; and "just do it!" (Id.) Ms. Romano alleges that Ms. Weakly frequently questioned her abilities and work ethic. (Id.) At a team meeting, after Ms. Romano commented, Ms. Weakly allegedly said, "nobody knows what you're talking about, let's move on." (Id.) Ms. Weakly denied making such remarks. (Weakly Dep. at 61-64.)

On March 28, 2011, Ms. Weakly held a meeting with Ms. Romano, Paula Doll-Wildenberg (Clinical Case Manager), and Marcia Hahn (Team Lead for the Clinical Case Management Team) to discuss the Werb claim. (Doll-Wildenberg Dep. at 11-14 [Doc. No. 51-1].) It is alleged that Ms. Weakly conveyed her strong personality at the meeting: she was "bossy" and "made it clear that she was the supervisor." (Id. at 30.) Ms. Weakly presented her findings and concerns about the Werb file. (Id. at 20-23.) The meeting was tense because Ms. Romano and Ms. Weakly differed in opinion about next steps. (Id. at 20, 29.) Ms. Romano felt that Ms. Weakly treated her disrespectfully at the meeting. (Romano Dep. at 149-50.)

The next day, Ms. Romano was allegedly forced to sign a letter drafted by Ms. Weakly. (Romano Decl. ¶ 14.) Ms. Romano then sent the letter to Mr. Werb's counsel. (Ex. E to Decl. of Susan M. Coler at ING-Romano005241 [Doc. No. 51-1].) This letter requested information about Mr. Werb's trips and his writings, and it informed him that an

independent medical examination was being arranged. (Id.) Ms. Romano alleges that she met with Mr. Corrigan to discuss her concern, and he agreed that they could not single out a claimant for this type of request. (Romano Decl. ¶ 15.) Ms. Romano allegedly overheard Mr. Corrigan tell Ms. Weakly that she should not request information from one claimant that she does not seek from others. (Romano Decl. ¶ 16.) Ms. Romano also spoke with an appeals person, Mary Kay Racette, about what it means to act in bad faith. (Romano Decl. ¶ 17; Racette Dep. at 33-35.)

### C. Ms. Romano's Complaints and ING's Subsequent Investigation of Ms. Weakly's Management Style and the Handling of the Werb File

On April 7, 2011, Ms. Romano made a complaint about Ms. Weakly to Kim Boylton, Human Resources Advisor. (Romano Dep. at 144-46; Boylton Dep. at 15-17 [Doc. No. 51-3]; Pl.'s Ex. 27 at 1 [Doc. No. 52-1].) Ms. Romano stated that Ms. Weakly was "bullying" and "harassing" her by managing her performance. (Pl.'s Ex. 27 at 1.) Ms. Romano also claimed that she did not want to write the letter to Mr. Werb's counsel because she felt it was "unethical." (Id.) Ms. Romano did not complain that the letter violated a particular law or that she was being asked to engage in an illegal activity. (Id.; Romano Dep. at 145-46, 184.)

Ms. Boylton referred Ms. Romano's complaint to ING's Human Resources Resolution Team ("HRRT"), the entity tasked with investigating and resolving employee concerns. (Pl.'s Ex. 27 at 1-2; Spahn Dep. at 140 [Doc. No. 46-7].) The case was assigned to Terri Spahn, Human Resources Resolution Consultant. (Spahn Dep. at 140.) Based in ING's office in Denver, Colorado, Ms. Spahn had never met Ms. Romano or Ms. Weakly.

(Romano Dep. at 184; Aff. of Terri Spahn in Supp. of Def.'s Mot. for Summ. J. ¶ 3 [Doc. No. 44].)  Ms. Romano told Ms. Spahn about Ms. Weakly's efforts to manage her performance, claimed that ING was handling Mr. Werb's claim "differently," and stated that she did not want to send the Werb letter because it was "wrong."  (Pl.'s Ex. 27 at 2.) Ms. Romano did not claim that ING's actions violated the law.  (Romano Dep. at 191-92.)

On April 8, 2011, Ms. Romano emailed Ms. Spahn, expressing concern about Ms. Weakly's instruction to obtain Mr. Werb's Social Security file.  (Pl.'s Ex. 27 at 2.)  Ms. Romano stated that she had never requested anyone's Social Security file and was "faced with doing something outside of our normal practice, on a claim that is in litigation."  (Id. at 2-3.)  Ms. Romano also stated that she no longer wanted to be a part of the Werb claim.  (Id. at 3.)

On April 18, 2011, Ms. Romano sent two emails to Ms. Spahn.  The first email sought help on behalf of her team and alleged that Ms. Weakly treated them disrespectfully. (Pl.'s Ex. 86 [Doc. No. 55-2].)  The second email stated that she had been ordered to seek an entire Social Security file from a claimant, which Ms. Romano felt "most likely violates the ING Code of Conduct and definitely goes against my ethics."  (Pl.'s Ex. 27 at 8-9.)  Ms. Romano asked to be removed from the Werb claim.  (Id. at 9.)

Ms. Spahn spoke with Ms. Doll-Wildenberg and Mr. Corrigan about Ms. Romano's concerns.  (Spahn Dep. at 141.)  Ms. Doll-Wildenberg told Ms. Spahn that the March 28, 2011 meeting was tense and that Ms. Romano and Ms. Weakly had both been rude to each other.  (Doll-Wildenberg Dep. at 47-48.)  Mr. Corrigan talked with other individuals on the Long-Term Disability team, and he did not discern any bullying or harassment on Ms.

Weakly's part.  (Corrigan Dep. at 41-42, 103.)  Mr. Corrigan noted that Ms. Weakly "is very good technically, but can be very direct and to the point."  (Spahn Dep. at 143.)  As for Ms. Weakly's handling of the Werb file, Mr. Corrigan viewed her requests as appropriate.  (Corrigan Dep. at 133-35.)  Based on her investigation, Ms. Spahn concluded that Ms. Weakly needed coaching on her "soft" communication skills, but she was not bullying or harassing Romano.  (Spahn Dep. at 143, 145-46.)  Ms. Spahn also concluded that Ms. Weakly's requests in relation to the Werb claim were appropriate.  (Id. at 152-54.)

Mr. Corrigan granted Ms. Romano's request for removal from the Werb file.  (Corrigan Dep. at 20-21.)  He removed her from the file because Ms. Romano "was not happy being on the file" and "did not agree with the direction of it," not because "there was anything that constituted abuse or harassment."  (Id. at 131.)  Mr. Corrigan re-assigned the Werb file to another Long-Term Disability DBA, Tonia Hackett, who denied the claim because the evidence did not support a finding of total disability.  (Id. at 153; Weakly Dep. at 55.)

Ms. Romano claims that she continued to experience bullying and harassment, including foul language, from Ms. Weakly.  (Romano Dep. at 234; Romano Decl. ¶ 23.)  Ms. Weakly denies such conduct.  (Weakly Dep. at 61.)  In June 2011, Ms. Weakly gave Ms. Romano constructive criticism for handling claimant calls.  (Pl.'s Ex. 27 at ING-Romano000425-27.)  In July 2011, Ms. Weakly allegedly disciplined Ms. Romano for taking unscheduled PTO.  (Romano Decl. ¶ 26; Pl.'s Ex. 31 at ING-Romano000118.)  Ms. Romano's title, duties, and pay did not change.  (Romano Dep. at 235.)

At his deposition, Mr. Corrigan reflected that Ms. Romano's complaints of

harassment seemed to start around the time Ms. Weakly began speaking to her about her attendance issues and cell phone use.  (Corrigan Dep. at 42.)  Mr. Corrigan concluded that the motivation for Ms. Romano's bullying and harassment claims were "in response to performance issues identified by Ms. Weakly."  (Id.)

### D.    Ms. Romano's 2011 Performance Review and Critique of Ms. Weakly

A few weeks before August 25, 2011, Ms. Weakly met with Ms. Romano about her mid-year performance review.  (Romano Dep. at 243-44; Pl.'s Ex. 31 [Doc. No. 52-1].)  Ms. Romano was upset by the review but did not say anything in the meeting, because she believed that her comments would provoke a verbal attack from Ms. Weakly.  (Romano Dep. at 244-45.)  Instead, Ms. Romano wrote a rebuttal in the "Comments" section at the end of the review.  (Id. at 246; Pl.'s Ex. 31 at ING-Romano000118-19.)  This rebuttal challenged several of Ms. Weakly's criticisms as unfair and inappropriate, closing with:

> I feel my manager uses this forum to express her dislike of me personally, and to continue her bullying behaviors against me.  In the 8 years I have worked for ING, I had never felt harassed, bullied, or overly stressed until working for this manager.  I feel she engages in retribution and have little doubt she will continue to do so since it appears to go unchecked.  I am certain her complaints against me will only increase now that I have defended myself on this review, but I am done saying nothing for fear of reprisal.  Fear to speak up is after all, what a bully depends on.

(Pl.'s Ex. 31 at ING-Romano000119.)  On August 25, 2011, at 2:00 p.m., Ms. Romano electronically submitted the review containing the rebuttal to Ms. Weakley.  (Romano Dep. at 246; Weakly Dep. at 94-96.)  Ms. Romano also sent her review and rebuttal to Ms. Spahn and Mr. Corrigan.  (Pl.'s Ex. 89 [Doc. No. 55-2].)

At approximately 2:45 p.m. that same day, Ms. Weakly received and read the

rebuttal.  (Weakly Dep. at 96.)  Ms. Weakly was "confused" and "mildly disturb[ed]" by the rebuttal because she was unaware of Ms. Romano's concerns, which were inconsistent with other employees' feedback.  (Id. at 96-97.)  Ms. Weakly asked Mr. Corrigan what she should do in response.  (Ex. 43 to Romano Dep. [Doc. No. 46-25].)  She also approached Jill Underhill, the Long-Term Disability Team Lead, who told Ms. Weakly that she did not agree with any of Ms. Romano's comments.  (Weakly Dep. at 98-100.)  Ms. Weakly then returned to her work.  (Ex. 41 to Romano Dep. [Doc. No. 46-23].)

### E.    Ms. Weakly Allegedly Assaults Ms. Romano

Ms. Romano contends that between 5:15 p.m. and 5:30 p.m. on August 25, 2011, she went to Ms. Weakly's cubicle to suggest discussing her rebuttal comments the next day.  (Romano Dep. at 249.)  As Ms. Romano entered the cubicle, Ms. Weakly was allegedly facing her with a stack of three-ring binders and spiral notebooks in her hands.  (Pl.'s Ex. 32 at 000005-6 [Doc. No. 52-1].)  Ms. Romano claims that Ms. Weakly looked at her "with hatred and rage in her eyes," and she swung the stack of binders and notebooks "like a baseball bat, striking me [Romano] full-force on my left ear and left side of my face."  (Id.)  Ms. Weakly then allegedly rushed past Ms. Romano and left the building without saying a word to Ms. Romano.  (Id.)  No one witnessed this event.  (Romano Dep. at 263.)

Ms. Romano contends that she was dazed for several minutes, after which she went to the bathroom and saw a tiny scratch on her face "like a pin prick" that bled a little.  (Romano Dep. at 253.)  She claims that she splashed water on her face and looked for someone to help her.  (Id.; Romano Decl. ¶ 27.)  Ms. Romano then found Kim Baker, the Head of Operations for the Employee Benefits Division.  (Romano Dep. at 253.)  Ms. Baker

described Ms. Romano as "distraught," "very upset," and "in shock." (Baker Dep. at 94-95.) While they were talking, Ms. Romano and Ms. Baker sat a few feet apart from each other at a round table in Ms. Baker's office. (Id. at 91-92; Romano Dep. at 254.) This meeting lasted approximately twenty to thirty minutes. (Baker Dep. at 96.) Ms. Baker did not observe a scratch, blood, or a contusion on Ms. Romano's face. (Id. at 89-92.) Ms. Baker observed Ms. Romano rubbing her cheek and saying that it was red, but Ms. Baker did not know Ms. Romano well enough to know whether Ms. Romano's cheeks were normally red. (Id. at 183-84; Pl's. Ex. 58 at ING-Romano006708 [Doc. No. 52-2].) Ms. Baker directed Ms. Romano to take the next day off with pay. (Baker Dep. at 99-100.) Ms. Romano did not mention anything about the Werb file. (Id. at 96, 101-102.)

After Ms. Romano returned to her desk, her sister, Karen Freeman, called her. (Romano Dep. at 256; Freeman Decl. ¶ 5 [Doc. No. 56].) Ms. Romano told her what happened, and Ms. Freeman told her to call the police to report the crime. (Freeman Decl. ¶ 6.) Ms. Romano called the police, and while she was waiting for them, she used her cell phone to photograph her face and Ms. Weakly's cubicle, where a notebook was lying on the floor. (Pl.'s Ex. 32 at ING-Romano000006 [Doc. No. 52-1]; Pl.'s Ex. 39 [Doc. No. 52-2].) The police came to the building and took a report, but they did not come up to the office because they did not investigate misdemeanors. (Romano Dep. at 256-57.) The report stated that a fifth-degree misdemeanor assault occurred. Ms. Romano returned to Ms. Weakly's cubicle, where she allegedly saw the notebook on the floor with a small smudge of blood and hair on it. (Pl.'s Ex. 32 at ING-Romano 000007.) Ms. Romano put the notebook in her bag for safekeeping and "because it was evidence of a crime." (Romano

Dep. at 258.)

While leaving the building, Ms. Baker and Ms. Romano ran into each other and had another conversation. (Id. at 258-59; Baker Dep. at 140.) This conversation lasted approximately thirty minutes, and Ms. Romano stood approximately three feet away from Ms. Baker. (Romano Dep. at 259; Baker Dep. at 140.) Again, Ms. Baker did not observe any scratch, blood, or a contusion on Ms. Romano's face or head. (Baker Dep. at 133, 139.) Ms. Romano removed her glasses and showed Ms. Baker where they were dented, although Ms. Baker did not recall dented glasses during their first encounter. (Pl.'s Ex. 42 [Doc. No. 52-2].) Ms. Romano did not show the notebook to Ms. Baker. (Romano Dep. at 259; Baker Dep. at 139.) Ms. Romano did not mention any complaints about the Werb file. (Baker Dep. at 96-100.)

After leaving the office that evening, Ms. Romano went to the emergency room because she had a headache and felt nauseous. (Pl.'s Ex. 64 at ING-Romano 000020 [Doc. No. 52-2].) The certified physician's assistant who examined Ms. Romano noted that she had a "superficial abrasion" on her left cheek and a "small hematoma" next to her left eye. (Id. at ING-Romano 000021.) A nurse took photographs of Ms. Romano's face, which appear to reveal a minor abrasion on her left cheek, a faint bruise near her temple, and a bend in the left ear piece of her glasses. (Pl.'s Ex. 68 [Doc. No. 54-1].)

In the days following the incident, Ms. Romano reported experiencing anxiety, fear, and distress. (Pl.'s Ex. 46 [Doc. No. 52-2].) She sought out mental health professionals and was diagnosed with post-traumatic stress disorder. (Id. at 7.)

### F. ING's Investigation of Ms. Weakly's Alleged Assault

On August 25, 2011, Ms. Baker emailed Ms. Spahn, asking Ms. Spahn to call her to discuss an "emergency." (Ex. 56 to Baker Dep. [Doc. No. 46-30].) On August 26, 2011, Ms. Baker relayed Ms. Romano's allegations against Ms. Weakly to Ms. Spahn. (Spahn Dep. at 26.) Ms. Baker also informed Mr. Corrigan of Ms. Romano's allegations. (Baker Dep. at 51-52.) Mr. Corrigan told Ms. Baker that Ms. Weakly was going to be on vacation the next day and the entire following week. (Id. at 51-52.)

On August 26, 2011, Ms. Spahn started investigating Ms. Romano's allegations. (Spahn Dep. at 24-25.) Ms. Spahn planned to speak to the parties involved, gather any documentation, and discuss resolution with Ms. Baker, who was the final decision maker. (Id. at 51, 53.) Ms. Spahn documented her investigation in ING's TRAK software system. (E.g., Pl.'s Ex. 27 [Doc. No. 52-1].) That same day, Ms. Spahn spoke with Ms. Weakly, Ms. Baker, and Ms. Romano about the alleged incident on August 25, 2011. (Spahn Dep. at 36.)

In her conversation with Ms. Spahn, Ms. Weakly denied Ms. Romano's allegations, outlined her whereabouts and activities the previous day, and sent a statement of her activities around the time of the alleged assault. (Id. at 36-38; Pl.'s Ex. 41 [Doc. No. 52-2].) Ms. Weakly also documented that her green spiral-bound notebook had gone missing on August 25, 2011, and she produced emails in which she asked three different people if they had seen it—the last of which was sent at 4:41 p.m. (Pl.'s Ex. 41; Exs. 33, 34, 35 to Romano Dep. [Doc. No. 46-19].) Ms. Weakly showed Ms. Spahn the email in which she asked Mr. Corrigan what to do with the allegations, if anything. (Ex. 43 to Romano Dep.

[Doc. No. 46-25].)

In her conversation with Ms. Spahn, Ms. Baker relayed what Ms. Romano had reported to her the previous night. (Spahn Dep. at 26-27.) When asked whether she had seen a scratch, blood, or a contusion on Ms. Romano's face, Ms. Baker responded that she had not seen any of those things. (Baker Dep. at 132-33.) Ms. Baker later submitted a written statement regarding her interactions with Ms. Romano on August 25, 2011, noting that "[t]here were no marks on Kathy's face, nor had there been any bleeding." (Ex. 42 to Romano Dep. [Doc. No. 46-24].)

In her conversation with Ms. Spahn, Ms. Romano repeated her allegations against Ms. Weakly. (Pl.'s Ex. 27 at ING-Romano000429 [Doc. No. 52-1].) In addition, Ms. Romano said that she had called the police and gone to the hospital. (Spahn Dep. at 30.) Ms. Spahn asked Ms. Romano to prepare a written statement describing the alleged incident on August 25, 2011.

On August 30, 2011, Ms. Romano faxed her written statement, dated August 29, 2011, to Ms. Spahn. (Pl.'s Ex. 32 [Doc. No. 52-1].) This statement recounted Ms. Romano's version of events on August 25, 2011. (Id.) Ms. Romano also informed Ms. Spahn for the first time that she had the notebook—the alleged instrument of Ms. Weakly's assault—in her possession, and that she wanted it preserved as evidence. (Id. at ING-Romano 000007.) Ms. Romano stated that the notebook had hair stuck in the spiral wire and a "smear of fresh blood on the back cover." (Id.) After reading Ms. Romano's statement, Ms. Spahn asked Ms. Romano to send her the notebook by overnight mail. (Spahn Dep. at 66.) Ms. Spahn also asked Ms. Weakly to provide a description of her

missing notebook, and Ms. Weakly complied.  (Id.)

On September 1, 2011, Ms. Romano sent Ms. Spahn the notebook and her original written statement about the assault.  (Ex. 62 to Baker Dep. [Doc. No. 46-32].)  Ms. Romano also informed Ms. Spahn that she had requested and would forward her medical records and police report.  (Id.)  Based on the writing in the notebook and Ms. Weakly's independent description of the notebook that had gone missing before the alleged assault, Ms. Spahn concluded that this notebook belonged to Ms. Weakly.  (Spahn Dep. at 66; see Pl.'s Ex. 70 [Doc. No. 5-1].)  When Ms. Spahn asked Ms. Romano why she had not reported possession of the notebook sooner, Ms. Romano claimed she had forgotten about it, and the notebook "didn't strike me [Romano] as being overly important."  (Romano Dep. at 262-63.)

In total, Ms. Spahn accumulated the following evidence for her investigation: Ms. Romano's written statement, documentation from her medical visits on August 25, 2011 and August 26, 2011, the notebook, the police report, statements from Ms. Weakly and Ms. Baker, emails from Ms. Weakly, and Ms. Romano's mid-year performance review.  (Spahn Dep. at 95-96.)  Ms. Spahn did not receive any photographs taken at the hospital from Ms. Romano, despite Ms. Spahn's request for them.  (Id. at 66-67.)  Ms.  Romano, however, recalled providing these photographs.  (Id.)

After analyzing the material collected and the notes of her conversations with Ms. Weakly, Ms. Baker, and Ms. Romano, Ms. Spahn was troubled that Ms. Romano had not mentioned the notebook to her or Ms. Baker earlier—especially because Ms. Romano alleged that it had her hair and blood on it.  (Spahn Dep. at 59, 61; Romano Dep. at 258.)  Ms. Spahn was further concerned about the inconsistency between the medical records,

which indicated that Ms. Romano had a contusion and an abrasion on her face, and Ms. Baker's observations of Ms. Romano on the day of the alleged assault, during which she saw no abrasion, blood, or bruising.  (Spahn Dep. at 105, 138-39.)  Ms. Spahn concluded that the alleged assault likely did not occur as Ms. Romano described it.  (Id. at 104-106.)

### G.    Ms. Baker's Decision to Terminate and Ms. Romano's Termination

Ms. Baker made the ultimate decision to terminate Ms. Romano's employment. (Spahn Dep. at 62-63.)  Aside from Ms. Baker's observations of Ms. Romano on the night of the alleged assault, Ms. Baker did not independently analyze any of the information submitted to Ms. Spahn.  (Baker Dep. at 59-60.)  Throughout the investigation, Ms. Spahn did not give Ms. Baker the underlying evidence concerning the alleged assault.  (Spahn Dep. at 62-63.)  Rather, Ms. Spahn verbally discussed the information she believed Ms. Baker needed to reach a decision.  (Id.)  Ms. Spahn limited her consideration of evidence to the alleged battery, excluding Ms. Romano's previous complaints about the handling of the Werb file or Ms. Weakly's management.[3]  (Id. at 72-75; Baker Dep. at 105.)  Ms. Baker was advised that the Werb matter was closed and irrelevant to her decision concerning Ms. Weakly's alleged assault.  (Baker Dep. at 105.)  Ms. Spahn did not recommend any specific action for Ms. Baker to take.  (Id. at 75-76.)

On September 19, 2011, Ms. Spahn and Ms. Baker called Ms. Romano to inform her of their decision to terminate her employment.  (Romano Dep. at 301-302; Baker Dep. at

---

[3] Ms. Spahn did not believe that Ms. Romano's complaints about the handling of the Werb file or Ms. Weakly's management related to the issue at hand, because Ms. Romano's earlier complaints from four months ago had been investigated and resolved.  (Spahn Dep. at 72-75.)

88, 104.) During the call, they explained the basis for termination, noting the absence of witnesses to the alleged assault; the fact that Ms. Weakly indicated the notebook was missing much earlier in the day; Ms. Romano's failure to report that she had the notebook until several days after the assault allegedly occurred; and the fact that Ms. Baker had not seen any laceration or scratch on Ms. Romano's cheek in the two meetings that occurred on the night of the incident. (Pl.'s Ex. 69 [Doc. No. 55-1].) Ms. Baker and Ms. Spahn concluded that Ms. Romano had fabricated a story about the assault. (Id.) Ms. Baker stated that Ms. Weakly would have been terminated instead of Ms. Romano if Ms. Weakly had admitted that she assaulted Ms. Romano. (Baker Dep. at 212.)

## III.   DISCUSSION

### A.   Summary Judgment

#### 1.   Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. (Id.) In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Khoury v. Group Health Plan, Inc., 615 F.3d 946, 952 (8th Cir. 2010). The

moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  (Id.)  The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  (Id.)

### 2.    Whistleblower Claim

Ms. Romano alleges that Defendant violated Minnesota's Whistleblower Act by terminating her in retaliation for reporting Ms. Weakly's handling of the Werb claim and for reporting Ms. Weakly's alleged assault.  (Am. Compl. and Jury Demand at ¶¶ 36-43 [Doc. No. 14].)  Minnesota's Whistleblower Act states, in relevant part:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;
>
> [or] ...
>
> (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason[.]

MINN. STAT. § 181.932, subd. 1.

In the absence of direct evidence, as here, Minnesota courts apply the three-step McDonnell-Douglas burden-shifting framework in analyzing retaliation claims under the Whistleblower Act. Wood v. SatCom Mktg., 705 F.3d 823, 828 (8th Cir. 2013). To establish a prima facie whistleblower claim, an employee must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. Rothmeier v. Inv. Advisers, Inc., 556 N.W.2d 590, 592 (Minn. Ct. App. 1996). The burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. (Id.) Finally, the employee may demonstrate that the employer's stated reason is pretextual. (Id.)

### a.    Reporting Ms. Weakly's Handling of the Werb Claim

Ms. Romano's reports about the Werb file present her concerns about sending the letter to Mr. Werb's counsel and requesting Mr. Werb's Social Security file. (Pl.'s Ex. 27 at ING-Romano 000413-415.) Ms. Romano submits that these actions violated ERISA, because Defendant was treating Mr. Werb's claim differently from other claims, applying standards differently to him, and asking Mr. Werb for information that Defendant did not seek from other claimants. (Romano Dep. at 183, 223-24.)

At issue is whether Ms. Romano engaged in statutorily protected conduct. The Whistleblower Act protects employees who, in good faith, report violations or suspected violations of law. While the statute does not define what constitutes a "report," Minnesota courts have defined a "report" as "relating or presenting concerns in an essentially official manner." Janklow v. Minn. Bd. of Exam'rs for Nursing Home

Admn'rs, 536 N.W.2d 20, 23 (Minn. Ct. App. 1995). An employee need not identify the specific law that she believes was violated, but she must allege facts that, if proven, would constitute a violation of law. Abraham v. Cnty. of Hennepin, 639 N.W.2d 342, 344 (Minn. 2002). The employee must also show that she made the report "for the purpose of blowing the whistle, i.e., to expose an illegality." Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000). In other words, the employee must subjectively believe that the conduct that she is reporting is unlawful—not just unethical or unfair—and the employee must be reporting the conduct because the conduct is illegal. Courts examine the employee's purpose at the time the reports were made. Obst, 614 N.W.2d at 202.

The record does not show that Ms. Romano made reports for the purpose of exposing an illegality. Regarding the Werb letter, Ms. Romano was concerned that it was "unethical." (Pl.'s Ex. 27 at 1.) Regarding the request for Mr. Werb's Social Security file, Ms. Romano informed Terri Spahn via email that she was "being told to do something which I [Romano] felt most likely violates the ING Code of Conduct, and definitely goes against my ethics." (Id. at 8.) In the same email, Ms. Romano also stated that she was "truly worried about this [the request for Werb's social security file] and the possible legal implications for ING." (Id. at 9.) The Court finds that these reports primarily reflect Ms. Romano's concern at the time that Defendant's conduct was unethical, and the general allusion to the possible legal implications is insufficient to show that Ms. Romano made the report to expose an illegality. Thus, Ms. Romano has not established that she engaged in statutorily protected conduct.

Even if Ms. Romano showed that she engaged in statutorily protected conduct, she

must establish its causal connection to her termination on September 19, 2011. See Rothmeier, 556 N.W.2d 592. Ms. Romano argues that such a causal connection exists because Ms. Baker knew about Ms. Romano's retaliation concerns as related to the Werb claim. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 35 [Doc. No. 50].) In the alternative, Ms. Romano argues that a causal connection exists under the cat's paw theory, where Terri Spahn and Paula Weakly are the biased subordinates using Ms. Baker as a dupe in a deliberate scheme to terminate Ms. Romano's employment. (Id.)

The Court disagrees that Ms. Baker terminated Ms. Romano because of her reports concerning the handling of the Werb claim. First, Ms. Baker was advised that the matter was closed and irrelevant to her decision concerning Ms. Weakly's alleged assault. (Baker Dep. at 105.) Ms. Baker also denied knowing about the substance of Ms. Romano's complaints regarding the Werb file. (Baker Dep. 111-12, 123, 177.) Ms. Baker's denials are corroborated by Mr. Corrigan and Ms. Spahn, who testified that they did not discuss the Werb complaints with Ms. Baker. (Corrigan Dep. at 102-103; Spahn Dep. at 72-75.) Second, Ms. Baker based her decision to terminate Ms. Romano on the inconsistencies between the assault allegations and her own observations of Ms. Romano on August 25, 2011, such as the lack of bruising, abrasion, and blood on Ms. Romano's face. (Baker Dep. at 104.) Ms. Baker also considered Ms. Spahn's investigation findings, which were limited to evidence about the alleged assault. (Id. at 76-77.) Because Ms. Baker did not know the substance of Ms. Romano's complaints concerning the Werb claim, Ms. Romano has not established the necessary causation with respect to the Werb complaints.

In the alternative, the cat's paw theory does not apply here, thus precluding a finding of causation regarding Ms. Romano's reports on the Werb file. The Eighth Circuit has addressed the cat's paw theory several times. Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 743 (8th Cir. 2009) (summarizing the cases). It describes "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (Id. at 742.) "[A]n employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006).

In this case, Ms. Baker was not a dupe. Ms. Baker based her termination decision on the discrepancies between what she personally observed of Ms. Romano on August 25, 2011, and what Ms. Romano's assault allegations and supporting documents later showed. (Baker Dep. at 104.) These considerations did not implicate the handling of the Werb claim.

Moreover, neither Ms. Spahn nor Ms. Weakly used Ms. Baker as a "conduit, vehicle, or rubber stamp" by which they achieved any unlawful design. See Richardson, 448 F.3d at 1060. Ms. Spahn did not have any stake in the investigation outcome. She was based in ING's Denver office and had never met Ms. Weakly or Ms. Romano. (Aff. of Terri Spahn ¶¶ 3-4 [Doc. No. 44].) In presenting her investigation findings to Ms. Baker, she did not recommend any specific action for Ms. Baker to take. (Baker Dep. at

75-76.) As for Ms. Weakly, no evidence suggests that she wielded any influence over Ms. Baker or tampered with Ms. Baker's decision-making. Indeed, Ms. Weakly never talked to Ms. Baker, and Ms. Baker did not consider Ms. Weakly's denial of the alleged assault when deciding whether to terminate Romano. (Id. at 212; Weakly Dep. at 121.) For these reasons, the cat's paw theory does not apply.

Regarding her reports on the Werb file, Ms. Romano has not shown that she was engaging in statutorily protected activity; and even if she were, Ms. Romano has not established its causal connection to her termination. Because no prima facie case exists, the Court grants Defendant's motion for summary judgment on Ms. Romano's whistleblower claims with respect to her reports concerning the Werb file.

### b. Reporting the Assault Claim

The Court next analyzes Ms. Romano's whistleblower claim regarding her reports of Ms. Weakly's alleged assault of Ms. Romano.

### i. Prima Facie Case

The parties contest whether Ms. Romano reported Ms. Weakly's alleged assault in good faith. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. at 23 [Doc. No. 42]; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 25 [Doc. No. 50].) Regarding Ms. Romano's report to Defendant, Ms. Romano stated that shortly after Ms. Weakly allegedly struck her, Ms. Romano found and informed Kim Baker, the Head of Operations for the Employee Benefits Division, of the incident. (Romano Dep. at 253-55.) Ms. Romano stated that she "needed help" and knew that she "had to report this [alleged assault] to someone because something very wrong had been done to me

24

[Romano] by an employee." (Romano Decl. ¶ 27.) Regarding Ms. Romano's report to the police, Ms. Romano claims that she intended to expose an illegality when she reported Ms. Weakly's alleged assault to the police. (Romano Dep. at 256.) Upon returning to her desk after the alleged assault, Ms. Romano spoke with her sister, Karen Freeman, about what happened. (Id.; Freeman Decl. ¶ 5.) Ms. Freeman told her to call the police to report the crime, and Ms. Romano complied as soon as she ended the call with Ms. Freeman. (Romano Dep. at 255-56.) The police arrived and spoke with Ms. Romano about the incident. (Id. at 256.)

The Court finds that the immediacy with which Ms. Romano reported the incident to Ms. Baker and the police; the substance of her conversations with Ms. Baker, Ms. Freeman, and the police; and the fact that Ms. Romano reported the incident to both Ms. Baker and the police demonstrate that she made the reports, and at a minimum, raise a fact issue as to whether they were made in good faith.

Ms. Romano must also establish a causal connection between her reports of the alleged assault and her termination on September 19, 2011. See Rothmeier, 556 N.W.2d at 592. Defendant's talking points for terminating Ms. Romano include a statement that "[b]ased on the fact that we believe that you [Romano] have fabricated this story [about Weakly's alleged assault], and have not provided any additional information to support your claim, we have made the decision to terminate your employment with ING effective immediately." (Pl.'s Ex. 69 at 1.) Ms. Baker also stated that Ms. Romano's termination related to the inconsistencies between her assault allegations and what Ms. Baker observed of Ms. Romano on the day of the alleged assault. (Baker Dep. at 104.) Ms.

Romano's assault allegations are the very substance of her reports to Defendant and the police. Without her reports of an alleged assault, Defendant would not have concluded that Ms. Romano fabricated the assault and consequently terminated her. Accordingly, the Court finds that Ms. Romano has established the requisite causal connection between her reports and her termination, thus enabling a prima facie whistleblower case.

### ii.      Legitimate, Non-Retaliatory Reason

The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. <u>Rothmeier</u>, 556 N.W.2d at 592. Here, Ms. Baker testified that she terminated Ms. Romano for misconduct, specifically for fabricating allegations of Ms. Weakly's assault. (Baker Dep. at 88, 104; Pl.'s Ex. 69 at 1.) Therefore, the Court finds that Defendant has met its burden.

### iii.      Pretext

To overcome summary judgment, Ms. Romano must point to evidence sufficient to permit a reasonable jury to find that Defendant's explanation for her termination is pretextual. <u>Rothmeier</u>, 556 N.W.2d at 592. Ms. Romano argues that the following facts support a finding of pretext: (1) Ms. Baker allegedly lied about what she observed the night of the assault and ignored all evidence corroborating Ms. Romano's truth-telling; (2) Defendant selectively decided what evidence to emphasize and what avenues to investigate; (3) Defendant failed, in its investigation of the alleged assault, to consider Ms. Weakly's motivation; (4) Defendant failed to follow its Workplace Violence Policy; and (5) the assault investigation and termination decision were not transparent or well documented. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 27-30 [Doc.

No. 50].)  Defendant counters that it did not violate its workplace policy, and the investigation of the alleged assault was not a sham.  (Reply Mem. in Supp. of Def.'s Mot. for Summ. J. at 5-6 [Doc. No. 58].)

The record shows facts upon which a reasonable jury could find that Defendant's reason for terminating Ms. Romano is pretextual for retaliation.  For example, a jury could find that Ms. Baker lied about her observations of Ms. Romano on August 25, 2011, where Ms. Baker stated that she "thought she could see some mild swelling on Kathy's cheek, but doesn't know Kathy well enough to be certain," but stated elsewhere that she saw "no marks on Kathy's face, nor had there been any bleeding."  (See Pl.'s Exs. 58, 42.)  Similarly, a jury could find pretext based on Defendant's incomplete investigation of the alleged assault, where Ms. Baker did not consider Ms. Weakly's motivation despite her past interactions with Ms. Romano, and Ms. Baker did not independently analyze any of the information submitted to Ms. Spahn.  (See Baker Dep. at 104, 144, 171.)  Moreover, the record suggests that Defendant may have failed to follow its Workplace Violence Policy.[4]  After Ms. Romano informed Ms. Baker about the alleged assault, Ms. Baker did not instruct security forces to prevent Ms. Weakly from entering the premises.  (Id. at 54.)  Although Ms. Baker knew that Ms. Weakly would be out of the office on the day after the alleged assault and the following week, she did not instruct Ms. Weakly to remain off the premises pending the outcome of the investigation.

---

[4] Defendant's Workplace Violence Policy states: "[a]ny person who engages in violent behavior on ING premises will be removed from the premises as quickly as safety permits and must remain off the premises pending the outcome of an investigation." (Pl.'s Ex. 9 at ING-Romano 000987 [Doc. No. 52-1].)

(Spahn Dep. at 51-52.)  These facts may permit a reasonable jury to find that Defendant's explanation is pretextual for retaliation.

Accordingly, the Court denies summary judgment on Ms. Romano's whistleblower claim regarding her reports of Weakly's alleged assault.

### 3. Battery Claim

Defendant argues that Ms. Romano's battery claim fails because (1) the alleged battery was not foreseeable, and (2) the battery claim is precluded by the Workers' Compensation Act.  (Reply Mem. in Supp. of Def.'s Mot. for Summ. J. at 8-10 [Doc. No. 58].)  Ms. Romano argues that Weakly's battery was foreseeable and that the claim is not precluded.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 39-42 [Doc. No. 50].)  The Court agrees with Defendant on both points.

### a. Foreseeability

Ms. Romano alleges that Defendant is liable for Ms. Weakly's tortious act—battery (Count Two)—under the theory of respondeat superior.  (Am. Compl. and Jury Demand at ¶¶ 44-48 [Doc. No. 14]; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 39 [Doc. No. 50].)

Under the doctrine of respondeat superior, an employer is vicariously liable for the torts of an employee committed within the course and scope of his or her employment.  Fahrendorff v. N. Homes, Inc., 597 N.W.2d 905, 910 (Minn. 1999).  "Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business."  (Id.)

The Minnesota Supreme Court has explained that an employer may be held liable for the intentional misconduct of its employees when (1) the source of the attack is related to the duties of the employee, and (2) the assault occurs within work-related limits of time and place. (Id.) In determining whether an attack is related to an employee's duties, Minnesota law focuses on the foreseeability of the employee's actions. (Id. at 912.) In this context, foreseeability means "a level of probability which would lead a prudent person to take effective precautions." (Id.) In a case alleging respondeat superior, foreseeability means that "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." (Id.)

In support of her foreseeability argument, Ms. Romano submits that management at ING knew about Ms. Weakly's "general aggressive nature" and "Weakly's aggression toward Plaintiff." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 40 [Doc. No. 50].) Ms. Romano also cites Mr. Corrigan's general understanding that aggression can lead to violence, and that "bullying is something that could become serious." (Id. at 41; Corrigan Dep. at 36-37.)

Ms. Romano's argument, however, is misplaced because she does not submit evidence sufficient to show foreseeability in the respondeat superior context. Ms. Romano must produce evidence that the alleged battery was foreseeable "in the context of the particular enterprise"—here, the disability claims industry. Ms. Romano does not present evidence that workplace violence is common in the disability claims industry.

Moreover, Ms. Romano concedes that Ms. Weakly had never been violent, and that

she never feared that Ms. Weakly would hit her. (Romano Dep. at 246, 296.) If Ms. Romano did not fear potential violence from Ms. Weakly and did not express such a concern to Defendant, Defendant could not have foreseen the alleged battery without evidence of other complaints. The record does not show any such complaints. (Aff. of Terri Spahn ¶ 4.)

Accordingly, the Court does not find Defendant vicariously liable for Ms. Weakly's alleged battery.

### b. Preclusion under the Workers' Compensation Act

The Workers' Compensation Act ("WCA") provides that employers "are liable to pay compensation in every case of personal injury . . . of an employee arising out of and in the course of employment without regard to the question of negligence." MINN. STAT. § 176.021, subd. 1. The employer's liability to pay worker's compensation "is exclusive and in the place of any other liability." Id. § 176.031. Thus, the WCA provides the exclusive remedy to employees for personal injuries arising out of and in the course of employment.[5]

---

[5] In the context of the WCA's exclusivity provision, the Minnesota Supreme Court has identified three categories of assault cases. The first two categories are only compensable under the WCA, and thus are subject to the Act's exclusivity provision: (1) when the provocation or motivation for the assault arises solely out of the activity of the victim as an employee; or (2) when the assault was random and neither directed against the victim as an employee nor for reasons personal to the employee. McGowan v. Our Savior's Lutheran Church, 527 N.W.2d 830, 834 (Minn. 1995) (holding that the assault exception did not apply to the rape of a female director of a homeless shelter because being in isolated places with male clients was both a potential job duty and a "causal factor"). The final assault category, which is outside of the WCA's exclusivity provision, occurs if the assailant is motivated by personal animosity toward the victim, arising from circumstances wholly unconnected with the employment. Id. at 834; Mehl v. PortaCo, Inc., 859 F. Supp. 2d 1026, 1035 (D. Minn. 2012) (applying assault exception where the plaintiff's duties as a welder put her at risk for groping, employer had no policy condoning such conduct, and individual

Id.  When the WCA provides the employee's exclusive remedy, a district court is without

subject-matter jurisdiction unless the employee can show that the alleged conduct falls

within an exception to WCA exclusivity.  Stengel v. E. Side Beverage, 690 N.W.2d 380,

383 (Minn. Ct. App. 2004).

The assault exception to the WCA excludes any injury caused by a fellow employee

intended "to injure the employee because of personal reasons, and not directed against the

employee as an employee, or because of the employment."  MINN. STAT. § 176.011, subd.

16.  An assault occurring during working hours, at the workplace, and that arises out of a

discussion about office affairs does not fall within the assault exception.  Parker v. Tharp,

409 N.W.2d 915, 917 (Minn. Ct. App. 1987).  In other words, to fall within the exception,

the assault must arise from personal circumstances that are entirely unrelated to the victim's

employment.  McGowan, 527 N.W.2d at 834.

Ms. Romano argues that her battery claim is not barred, citing the assault exception

to WCA exclusivity.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 42 [Doc.

No. 50].)  The Court disagrees.  The August 25, 2011 incident, on which Ms. Romano bases

her battery claim, occurred in the workplace during working hours.  Ms. Romano also

alleges that Ms. Weakly threw a stack of binders and notebooks at her in the context of a

workplace conflict—specifically, as she approached Ms. Weakly's cubicle to discuss her

rebuttal comments.  (Romano Dep. at 249-51.)  Ms. Romano has not alleged that Ms.

Weakly threw the items because of personal animosity toward Ms. Romano unrelated to her

defendant's actions were personal, having no association with the plaintiff's duties as a
welder).

employment. Nor has Ms. Romano presented evidence of a personal relationship outside the workplace. Thus, the assault exception to the WCA does not apply here.

Because the alleged battery was not foreseeable and the assault exception to the WCA does not apply, the Court grants Defendant's motion for summary judgment on Ms. Romano's battery claim.

### 4. Negligent Supervision Claim

A negligent supervision claim requires an employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons. Cook v. Greyhound Lines, Inc., 847 F. Supp. 725, 732 (D. Minn. 1994).

Defendant argues that it exercised reasonable care in supervising the employment relationship between Ms. Weakly and Ms. Romano, and the alleged battery was not foreseeable. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. at 34-35 [Doc. No. 42].) Ms. Romano responds that a genuine issue of fact exists as to whether Defendant breached its duty of care to supervise Ms. Weakly and whether Ms. Weakly's alleged battery was foreseeable. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 43-45 [Doc. No. 50].)

The record shows that Defendant exercised reasonable care in supervising the employment relationship between Ms. Weakly and Ms. Romano. Upon learning Ms. Romano's complaints about Ms. Weakly's conduct in April 2011, Defendant completed an investigation that revealed no evidence of bullying and harassment. (Corrigan Dep. at 41-42, 103.) Rather, it showed Ms. Weakly's attempts to address Ms. Romano's performance

issues with personal cell phone use and attendance. In addition, to mitigate Ms. Romano's concerns about the handling of the Werb file, Mr. Corrigan granted Ms. Romano's request to stop working on this claim. (Id. at 20-21.) Ms. Romano also had continued access to support via Terri Spahn and the Human Resources team if she had additional concerns about Ms. Weakly. (Ex. 27 to Romano Dep. [Doc. No. 46-13].)

The record also shows that Ms. Weakly's alleged battery was not foreseeable. Foreseeability in the negligent supervision context requires that the "employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct." Johnson v. Peterson, 734 N.W.2d 275, 278 (Minn. Ct. App. 2007). Here, Ms. Romano concedes that Ms. Weakly had never been violent, and that Ms. Romano never feared that Ms. Weakly might become violent. (Romano Dep. at 246, 296.) Where Ms. Romano did not express such a concern to Defendant, Defendant could not have foreseen the alleged battery without evidence of other complaints—of which there is none. (Aff. of Terri Spahn ¶ 4.)

Because Defendant exercised reasonable care in supervising the employment relationship between Ms. Weakly and Ms. Romano, and because Ms. Weakly's alleged battery was not foreseeable, the Court grants Defendant's motion for summary judgment on the negligent supervision claim.

## B. Ms. Romano's Objections to the Magistrate Judge's Order Denying Her Motion to Amend Complaint to Claim Punitive Damages

On November 1, 2012, Ms. Romano moved to amend the Complaint to claim punitive damages with respect to her claim that Defendant terminated her for reporting Ms.

Weakly's alleged assault.[6]  (Pl.'s Mot. to Am. Compl. to Claim Punitive Damages [Doc. No. 18]; Pl.'s Mem. of Law in Supp. of Mot. to Am. Compl. to Claim Punitive Damages at 1-2 & n.1 [Doc. No. 20].)  Defendant opposed Ms. Romano's motion.  (Def.'s Resp. in Opp'n to Pl.'s Mot. to Am. Compl. to Claim Punitive Damages [Doc. No. 23].  On November 15, 2012, Magistrate Judge Jeffrey J. Keyes heard Ms. Romano's motion.  (Notice of Hr'g on Mot. to Am. Compl. to Claim Punitive Damages [Doc. No. 19].)

On November 26, 2012, the Magistrate Judge denied Ms. Romano's Motion to Amend Complaint to Claim Punitive Damages.  (Order [Doc. No. 29].)  On December 10, 2012, Ms. Romano objected to the Magistrate Judge's Order.  (Pl.'s Objections to Order of Magistrate Judge Denying Mot. to Am. Compl. to Claim Punitive Damages at 1-2 [Doc. No. 31].)  On December 24, 2012, Defendant responded to Ms. Romano's objections.  (Def.'s Resp. to Pl.'s Objections to Magistrate Judge Keyes's Order Denying Pl.'s Mot. to Am. The Compl. to Claim Punitive Damages [Doc. No. 33].)  Ms. Romano's objections to the November 26, 2012, Order are now before this Court.

### 1.    Standard of Review

The standard of review applicable to an appeal of a Magistrate Judge's order on nondispositive pretrial matters is extremely deferential.  Reko v. Creative Promotions, Inc., 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).  The Court will reverse such an order only if it is clearly erroneous or contrary to law.  FED. R. CIV. P. 72(a); D. Minn. L.R. 72.2(a).

---

[6] Ms. Romano does not seek punitive damages in connection with Defendant's other alleged retaliatory purpose for her termination—that Ms. Romano reported Ms. Weakly's handling of the Werb claim.  (Pl.'s Mem. of Law in Supp. of Mot. to Am. Compl. to Claim Punitive Damages at 1-2 & n.1 [Doc. No. 20].)

A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed. Reko, 70 F. Supp. 2d at 1007. A decision is "contrary to law" when it fails to apply or misapplies relevant statutes, case law or rules of procedure. Knutson v. Blue Cross & Blue Shield of Minn., 254 F.R.D. 553, 556 (D. Minn. 2008). If the magistrate judge's account of the evidence is plausible in light of the record viewed in its entirety, the reviewing court may not reverse it even though had it been sitting as the trier of fact, it would have weighed the evidence differently. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985). This standard of review applies to motions to amend for punitive damages. Ansari v. NCS Pearson, Inc., No. 08-5351, 2009 WL 2337137, at *12 (D. Minn. July 23, 2009).

### 2. Prima Facie Standard

Minnesota's punitive damages statute allows such damages "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." MINN. STAT. § 549.20, subd. 1. A party cannot claim such damages upon commencement of the action; rather, it must move to amend after filing, properly alleging the legal basis and including affidavits showing the factual basis. Id. § 549.191. "[I]f the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages." Id.

When deciding whether Ms. Romano has established a prima facie case, the Court "makes no credibility rulings, and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof." Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004,

1008 n.3 (D. Minn. 2003). But "the function of the trial court is to do more than 'rubber stamp' the allegations in the motion papers," and the Court must determine if there is evidence in the record to support the plaintiff's prima facie case. Shetka v. Kueppers, Kueppers, Von Feldt & Salmen, 454 N.W.2d 916, 918 n.1 (Minn. 1990).

### 3.    The Magistrate Judge's Analysis

After thoroughly considering the facts of this case, [Doc. No. 29 at 2-12], the Magistrate Judge denied Ms. Romano's Motion to Amend Complaint to Claim Punitive Damages because Ms. Romano did not make a prima facie showing of clear and convincing evidence that Defendant deliberately disregarded Ms. Romano's rights. (Id. at 17.) Focusing on Ms. Romano's essential argument that Defendant conducted a sham investigation, the Magistrate Judge found that the possibility of innocent explanations for Defendant's conduct during the investigation precluded a prima facie showing of clear and convincing evidence of Defendant's intentional retaliation against Ms. Romano for reporting the alleged assault. (Id. at 14-15.)

Ms. Romano argues that the Magistrate Judge erred in requiring her to eliminate possible innocent explanations of the evidence. (Pl.'s Objections to Order of Magistrate Judge Denying Mot. to Am. Compl. to Claim Punitive Damages at 9 [Doc. No. 31].) The Court disagrees. The high standard of "clear and convincing" evidence makes the existence of other innocent explanations of the evidence relevant. That is, Ms. Romano cannot meet the clear and convincing standard if equally viable explanations for Defendant's conduct during the investigation exist. The Court agrees with the Magistrate Judge's view that Ms. Romano's evidence "could just as easily suggest that Defendant's human resources

personnel are mediocre investigators" or "that Baker and Spahn legitimately considered and weighed the evidence they believed was most important and ultimately concluded that they could not believe Romano's story." (Order at 14 [Doc. No. 29].) The possibility of these alternate explanations prevents Ms. Romano from meeting the clear and convincing standard.

In addition, the Magistrate Judge considered the context of Ms. Romano's retaliation claim, contrasting the situation here—an employee's report of a supervisor's alleged assault—with one in which an employee exposes her employer's failure to comply with the law or when an employee refuses to comply with a supervisor's unlawful order. (Id. at 16.) In declining to infer Defendant's retaliatory intent from Ms. Romano's evidence, the Magistrate Judge observed that it was "hard to imagine what any employer would think it stood to gain from firing an employee for reporting an assault in the workplace and simultaneously protecting the potentially dangerous employee who committed the offense." (Id.) The Magistrate Judge did not need to make such a finding to support his ruling, but doing so was not clear error.

Ms. Romano also objects that the Magistrate Judge did not analyze "deliberate disregard" under the full text of Minn. Stat. § 549.20.[7] (Pl.'s Objections to Order of

---

[7] Subdivision 1(b) of the statute defines "deliberate disregard":

A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

Magistrate Judge Denying Mot. to Am. Compl. to Claim Punitive Damages at 9 [Doc. No. 31].)  The Order, however, explains that Ms. Romano did not establish a prima facie case of clear and convincing evidence that (1) Defendant deliberately acted in conscious or intentional disregard of the high probability of injury to Ms. Romano's rights, or (2) deliberately acted with indifference to the high probability of injury to Ms. Romano's rights, when Defendant investigated the assault allegations and decided to terminate Ms. Romano's employment based on the investigation findings.  Therefore, the Magistrate Judge's failure to refer specifically to both prongs of the statutory definition is not clear error.

The fact that Ms. Romano cited evidence to support her theory of the case—that Defendant had retaliatory intent and conducted a sham investigation to cover up that intent—is insufficient to establish a prima facie case of clear and convincing evidence that Defendant deliberately disregarded her rights.  Because the Magistrate Judge thoroughly and reasonably considered Ms. Romano's evidence, possible innocent explanations for Defendant's conduct during the investigation, and the particular context of Ms. Romano's report of Ms. Weakly's alleged assault, the Court finds that the Magistrate Judge's Order is not clearly erroneous or contrary to law.

---

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

MINN. STAT. § 549.20.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendant's Amended Motion for Summary Judgment [Doc. No. 47] is **GRANTED IN PART** and **DENIED IN PART**, and

2.  Plaintiff's Objections [Doc. No. 31] are **OVERRULED**, the Magistrate Judge Order of November 26, 2012 [Doc. No. 29] is **AFFIRMED**, and Plaintiff's Motion to Amend Complaint to Claim Punitive Damages [Doc. No. 18] is **DENIED**.


Dated:        July 9, 2013                         s/ Susan Richard Nelson_____
                                                   SUSAN RICHARD NELSON
                                                   United States District Court Judge